## MATHESON et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4.

Circuit Court of Appeals, Second Circuit.

Dec. 7, 1931.

Willard N. Baylis and George P. Sanborn, both of New York City, and Parke A. Galleher, of Washington, D. C., for petitioners.

G. A. Youngquist, Asst. Atty. Gen., J. Louis Monarch and J. P. Jackson, Sp. Assts. to Atty. Gen., C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Harold Allen, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The first question raised by the appeal is whether this court has jurisdiction to re-

view the proceedings of the Board of Tax Appeals.

William J. Matheson maintained a residence and a business office within the state of New York and also a residence within the state of Florida. He filed his income tax returns in the office of a collector of internal revenue within the Second circuit. The Commissioner assessed a deficiency against him, and he sought a review before the Board of Tax Appeals. While that proceeding was pending he died, and the executors of his will were substituted as parties by order of the Board. One of them, Willis D. Wood, was an inhabitant of the state of New York, and the other, Hugh M. Matheson, an inhabitant of the state of Florida.

Venue for appeals from the Board of Tax Appeals to the courts of appeal is governed by section 1002 of the Revenue Act of 1926, which provides for review: "(a) In the case of an individual, by the Circuit Court of Appeals for the circuit whereof he is an inhabitant, or if not an inhabitant of any circuit, then by the Court of Appeals of the District of Columbia." 26 USCA § 1225(a).

Because of the fact that William J. Matheson died before this appeal was taken and his executors were inhabitants of different districts, it is claimed that the present review is by a person who is "not an inhabitant of any district," and therefore must be had in the Court of Appeals of the District of Columbia. But, after the death of William J. Matheson, his executors became the real parties in interest. McNutt v. Bland, 2 How. 9, 11 L. Ed. 159. Each executor could, therefore, seek a review in the Court of Appeals of the circuit whereof he was an inhabitant, and the appeal in the present case might lie either to the Court of Appeals of the Second Circuit, of which Willis D. Wood was an inhabitant, or to the Court of Appeals of the Fifth Circuit, of which Hugh M. Matheson was an inhabitant. In Rusk v. Commissioner, 53 F.(2d) 428, the Court of Appeals of the Seventh Circuit held that the death of a taxpayer pending a review before the Board of Tax Appeals did not abate the proceeding. The taxpayer's executors, who were residents of the Seventh circuit, were substituted, and the decision by the Tax Board went against them. It was held that an appeal from the Board of Tax Appeals properly lay to the Circuit Court of Appeals of the Seventh Circuit because the word "individual" used in

section 1002 (a) of the Revenue Act of 1926 embraced executors as well as the original taxpayer.

The words of section 1002 (a) providing that appeals by individuals who are not inhabitants of any circuit should be taken to the Court of Appeals of the District of Columbia apparently relate to persons living outside of any circuit, and cannot reasonably be thought to cover resident taxpayers who die leaving executors living within one of the circuits. The burden of requiring representatives of such estates to proceed to Washington to have their appeals heard should not be imposed without the plainest language. We think the appeal was properly taken.

█ The important question remaining for consideration is whether the Board of Tax Appeals erred in refusing to allow $42,692.26 paid out by William J. Matheson in 1922 and $28,655.05 paid out in 1923 for losses arising from an alleged "casualty" deductible under section 214 (a) (6) of the Revenue Act of 1921 (42 Stat. 239). Section 214 (a) provides that:

"In computing net income there shall be allowed as deductions:"

"(6) Losses sustained during the taxable year of property not connected with the trade or business * * * if arising from fires, storms, shipwreck, or other casualty, or from theft, and if not compensated for by insurance or otherwise. Losses allowed under paragraphs (4), (5), and (6) of this subdivision shall be deducted as of the taxable year in which sustained unless, in order to clearly reflect the income, the loss should, in the opinion of the Commissioner, be accounted for as of a different period. * * * "

The loss which the taxpayer sought to deduct from his income was due to a rapid deterioration of his residence built on Key Biscayne, an island in Biscayne Bay, about twelve or fifteen miles south of Miami, Fla. His residence consisted of two stories in Moorish design, with a landing stage or basement extending over the waters of Biscayne Bay and in part over the low lands of Key Biscayne. The Board of Tax Appeals determined that:

"The foundation on which the superstructure was laid consisted of piles driven into the mud to bed rock and encased in concrete. Of these piles 310 were entirely under water and the remainder, 100 in number, protruded a few feet above mean water

level. The longest span from center to center of any of the piles was three feet, but a great number of piles were so placed that there was only a two-foot span from center to center. As originally built no fill or rubble was placed around the piling, a dock being constructed to permit yachts to dock alongside the residence.

"Concrete sills were placed on the piling and four inch floor beams were then constructed from sill to sill. The floor beams were made of concrete reenforced with 7/8ths inch steel bars and had a span of 28 feet. It was not possible to obtain locally 7/8ths inch steel bars 28 feet in length and in lieu thereof there was employed in the construction of each floor beam 16-foot lengths of 7/8ths inch steel which were lapped in the middle of each beam for a distance of two feet. This lapping caused four 7/8ths inch bars to be placed together in a four inch concrete beam, leaving only a thin shell of concrete covering the four bars at the center of the span. Such method of construction permitted salt moisture to penetrate the porous cement and come in contact with the reenforcing steel bars. This caused the bars to rust and corrode and converted the point where the most strength was needed in the whole structure into a point of weakness.

"This rusting and corrosion spread progressively to all of the reenforcing steel used throughout the structure, as well as other metal used in the construction of the building, such as electric light conduits, etc. During the year 1922 the roof and every concrete floor of the structure was in imminent danger of falling. The lower part of the concrete joists and terra cotta filler tiles had become detached from the body of the construction, leaving the reenforcing steel hanging free and without bond in the concrete. The concrete protecting the piling supporting the foundation of the building had been washed away leaving the wooden piles exposed. The petitioner caused the damage to his residence to be repaired, expending in such repairs approximately $2,500 during the year 1921, $42,692.26 during the year 1922, and $28,655.05 during the year 1923. * * *"

The Board of Tax Appeals concluded that the damage which had to be repaired was due to a progressive deterioration caused by faulty construction, and not to any "casualty," within the meaning of section 214 (a) (6), and accordingly refused to allow the cost of repairs as a deduction from gross income.

The taxpayer introduced evidence showing an unusual rainfall during 1922 and 1923, and a storm, the effects of which he thought disastrous, which occurred on February 21, 1922. But there was evidence that the rainfall could not perceptibly raise the water level of the ocean and that the wind never reached a velocity of more than thirty miles per hour. The question, therefore, arises whether a rapid disintegration of the foundations of an edifice built over waters and lowlands, which, if well constructed, would stand for years, can be regarded as a "casualty."

■■■ In our opinion, the word "casualty" as used in section 214 (a) (6) is an event due to some sudden, unexpected, or unusual cause. Anything less than this renders it hardly distinguishable from depreciation from ordinary wear and tear which cannot be deducted by a taxpayer in the case of property that is not used in trade or business. Section 214 (a) (8). While it is contended that the concrete casing of the piles was washed away by storms and tides so that the piles became exposed, eaten by worms, and weakened, the evidence that there were no unusual winds and that there was nothing to cause extraordinary tides afforded a substantial basis for the conclusion of the Board of Tax Appeals that the loss was due only to the ordinary action of the elements upon a poorly constructed building. In such circumstances we are bound by its findings and hold that the damage did not arise from a casualty resembling "fires, storms or shipwreck." The disintegration was due to encasement of the steel framework in walls of concrete so thin as to let in moisture and give rise to corrosion, and to inadequate sheathing of the piles. This conclusion seems inevitable when the proof of any serious storm or cataclysmic operation of the elements failed. No time is satisfactorily established when any serious injury to the foundation occurred. It was never overwhelmed by any unusual thing. There was simply a steady labefaction from wind and weather more rapid than usual because of structural defects. Such a deterioration cannot reasonably be termed a casualty. Crystal Spring Distillery Co. v. Cox (C. C. A.) 49 F. 555; Forsdick v. Board of Supervisors of Quitman County (Miss.) 25 So. 294; Eaton v. Glindeman, 33 Idaho, 389, 195 P. 90.

In Shearer v. Anderson (C. C. A.) 16 F.(2d) 995, 996, 51 A. L. R. 534, the taxpayer's automobile was overturned and damaged (while in the unauthorized possession of a chauffeur) because of the icy condition of the road, resulting from storms and freezing. We held that the loss was a "casualty" within the meaning of the Revenue Act and said that the word "casualty" expresses "rather the result than the cause of the damage, that is, the wreck itself rather than the lightning, storm, or the negligence or fault of some person. * * *" The loss there was, however, due to a sudden accident and to nothing resembling mere deterioration more rapid than usual. We do not suggest that the destruction of a building by an unusual storm would not be a "casualty" if the edifice was so badly constructed as to be readily destroyed. We simply hold that a loss due, as here, to progressive decay or corrosion, occurring without any unusual action by the elements, does not arise from a "casualty" within the meaning of the statute.

The order is affirmed.