RAYMOND TANK AND ELIZABETH TANK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60969.    Filed January 23, 1958.

*G. Charles Scharfy, Esq., and Robert Kniffin, Esq.*, for the petitioners.

*Maurice B. Townsend, Jr., Esq.*, for the respondent.

678

## OPINION.

HARRON, *Judge:* Petitioner claims deduction for a loss from "other casualty" under section 23 (e) (3) of the 1939 Code.[1]  Cracks developed in petitioner's new house and he contends that the damage resulted from a casualty, and that loss was sustained in the taxable year measured by the difference in the fair market value of his property before and after the development of the cracks.  Petitioner has the burden of proving that in the taxable year there was a casualty which comes within the term "other casualty," that loss was sustained, and the amount of the loss.

The question of the amount of loss, if loss was sustained, is a question of fact.  Whether there was an "event" which constituted "other casualty" within that term as it is used in section 23 (e) (3) is often largely a question of fact, also.  Here, however, petitioner's contentions present a question which ordinarily is not involved, namely, whether in order to come within the term "other casualty" it is necessary to prove the cause of the damage.

Petitioner contends first that he has established that the cracks could not have resulted from a cause connected with the work done or the materials used in constructing the house and that, therefore, he has established that they resulted from no other cause than a "shifting of the underlying" land which should be held to be within the term "other casualty."  This argument proceeds along the line of attempting to eliminate various possible causes which would not come within the scope of section 23 (e) (3).  Petitioner also contends that "it is not essential to pinpoint with meticulous nicety the background or early causative factors which led up to the damage," and it is sufficient if the damage proceeded from an "unknown cause."

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

*     *     *     *     *     *     *

(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

*     *     *     *     *     *     *

(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or theft. * * *

There is such large degree of confusion in petitioner's approach to the matter of the nature of his burden of proof that it appears necessary to restate certain principles which seem to have been so well established as not to have required any extended discussion in cases dealing with the same kind of questions as are presented here.

Two principles which appear to be obvious are that in order for a loss from damage to property to be deductible under section 23 (e) (3), it must be shown that the damage which occurred was *a direct result* of a casualty which is established by the taxpayer to come within the intendment of section 23 (e) (3), 5 Mertens, Law of Federal Income Taxation sec. 28.52; and that a taxpayer claiming the loss must be prepared to prove that the loss, if any, was sustained as a result of the casualty. *Emily Marx*, 13 T. C. 1099. The wording of section 23 (e) (3), "if the loss arises from fires, storms, shipwreck, or other casualty," requires proof that fire, storm, shipwreck, or "other casualty" was the proximate cause of the damage to property and loss. Furthermore, the provisions of section 23 (e) (3) must be carefully rather than liberally construed, and the intendment of the Congress followed. *New Colonial Co.* v. *Helvering*, 292 U. S. 435, 440; *B. M. Peyton*, 10 B. T. A. 1129, 1131; *Lyman* v. *Commissioner*, 83 F. 2d 811, 814; *Keenan, Jr.* v. *Bowers*, 91 F. Supp. 771, 773.

In applying the doctrine of *ejusdem generis* in order to determine the meaning of "other casualty," the courts have resorted to dictionary definitions of accident and casualty, and have analyzed the causative factors in each case. So particular has this process of analysis and correlation been in individual cases that it is difficult to abstract from them satisfactory general rules. For example, see *Keenan, Jr.* v. *Bowers, supra*, where it was necessary to catalog examples of what is "other casualty," and what is not. However it is noted that faulty construction has been held not to be "other casualty." *William J. Matheson*, 18 B. T. A. 674 affd. 54 F. 2d 537. And where a loss is caused by a chain of events on the part of individuals, and there is "no intervening sudden force, cause or occurrence which brought on the event such as would ever be present in a casualty arising from fires, storms, or shipwreck," it has been held that the event or accident resulting in loss was not of the same kind "as would be caused by fire, storm or shipwreck." *Keenan, Jr.* v. *Bowers, supra*, p. 775.

The burden of proof upon petitioner in this case, as in all cases, requires that petitioner must establish that there was a casualty within the meaning of "other casualty" in the statute, and a careful review of the authorities shows that in order to meet this burden of proof the proximate cause of the damage to property must be shown. The burden of proof is not satisfied by making assumptions, or relying on hearsay about general conditions which are not shown to have existed on or in the property which has been damaged, or by presenting self-

serving opinions, or by alleging that the proximate time is unknown. Rationalization from definitions of accident and casualty does not suffice.

It is now established that an extensive and deep sinking of land caused by a subterranean disturbance is "other casualty" within the meaning of the statute, even though the exact cause of such subterranean disturbance is not known or ascertainable. *Harry Johnston Grant*, 30 B. T. A. 1028, 1035. However, the taxpayer there produced proof that the proximate cause of the sinking of land was a subterranean disturbance. He, and other property owners, hired engineers with expert scientific and engineering knowledge to ascertain the cause of the sinking of land on his property. The engineers made extensive investigations and surveys which involved digging into the earth, studying substrata, locating subterranean movements of masses of a particular type of material. Such investigations were made by persons having special knowledge and skill. They established the existence of several conditions and a cause of the sinking of land. The taxpayer introduced evidence about the surveys, the conditions, and causes for the sinking of the taxpayer's land. Such evidence established that subterranean disturbance was the cause. This Court held that a subterranean disturbance which causes a sinking of land constitutes "other casualty."

Petitioner relies upon the *Grant* case, but he attempts to find in our Opinion a rule which is not there, namely, that sudden and unexpected damage to property, "the exact cause of which is unknown" is "other casualty." Of course, we did not express any such view in the *Grant* case. Neither did we say that the taxpayer had not proved any proximate cause of the damage to his property. Rather we said that the damage, a sinking of land, "was an unusual effect of several causes and conditions" which the facts which were found described in detail. Petitioner's argument is based upon a clear instance of taking out of context part of a sentence (see p. 1035) which in an abundance of thoroughness stated that the *original* cause of the direct cause of the damage was unknown.

The *Grant* case, on the proof which was presented by the taxpayer and on the facts found from such proof, is distinguishable from this case.

The Commissioner has ruled, following the *Grant* case, that a "relatively rapid and severe subsoil shrinkage resulting from unusually severe drought which has weakened either vertical or lateral support for building foundations" resulting in "extensive cracking of walls and other serious damage to buildings in the area which can be attributed neither to faulty construction nor to such gradual settlement or subsidence as may normally occur over a period of years" may be such an identifiable event fixing a point at which loss to the

owner of damaged property can be measured as to be "other casualty" within section 23 (e) (3). Rev. Rul. 54–85, 1954–1 C. B. 58. However, the burden of proving that the cause of any damage to property is of the nature described in the ruling rests upon the taxpayer. It is noted that in cases where the *Grant* case has been followed, taxpayers presented proof of a phenomenon which was sudden, unexpected, and unusual, rather than gradual and progressive. One way by which a taxpayer can successfully fulfill his burden of proof, where he alleges that the proximate cause of damage to a building was some such natural phenomenon as a subterranean, earth movement or a subsoil condition, is to present proof through a specialist or qualified expert in foundation work and subsoil conditions who has made examination of the taxpayer's property above and beneath the surface of the land. Such expert, for example, might conduct his examination by making rather deep, exploratory openings in the earth which might establish a direct cause of cracks in a building.

Petitioner has failed to produce evidence about the condition of the earth under or near his house. He presented no analysis by an independent, competent expert. He did not hire one to explore the conditions of the earth under his house. Petitioner, and his witnesses, merely made assumptions, which if proved, would bring this case under the rule of the *Grant* case. Petitioner has failed to prove that the damage to his house was the result of "a subterranean disturbance," or an unstable condition of the earth beneath his house or elsewhere on his property, or a movement under or slippage of his property. Illustrative of such failure are the following observations about the record:

The house in question was a new house, the construction of which was close to completion when the cracks complained of developed and at that time petitioner and his wife had not moved into the house. There was no known, visible, or ascertainable *event* on or about October 16, 1951, of an external type which could have affected the house or the land on which it stood, such as an earthquake, a storm, heavy rains, or the impact of some strong force. Adjacent houses were not affected at or about the same time.

The supervising architect, Clark, testified as follows: "There was something wrong. At that time we honestly did not know what caused it." Clark and the contractor examined the house and the property immediately after petitioner notified the architects of the development of the cracks. The record indicates that their examination consisted of no more than looking at the house and the land. They did not make any opening in the earth around the foundation walls, or under the house, or anywhere on the property. They did not make an exhaustive or even a diligent investigation to try to find out what had caused the cracks, and petitioner did not do so either.

Neither petitioner nor those who were then responsible for constructing the house and turning it over to the owner in first-class condition, sought or engaged a competent expert in matters of the kind which were involved. No competent, independent, disinterested person having technical training and experience, such as an engineer, or geologist, or any independent person having particular knowledge about structural design, tensions, materials, weight distribution, or subsurface conditions of earth, or such matters was employed to examine the property to determine the cause of the cracks. Clark advised a wait-and-see policy, and so petitioner waited and he continued to do that for 6 years. No other cracks developed and the proximate cause of the cracks was never ascertained in any objective and disinterested way.

The contractor was not called to testify; only Clark gave testimony. Although he is a graduate, licensed architect and, therefore, must be regarded as competent, he was the supervising architect, and his opinions must be considered along with the fact that his firm and that of the contractor were working together on the construction of the house and both had the self-serving interest which those under contract must have. They were in the position of having to bear the cost of repairs or the payment of damages if their negligence, omissions, or faulty work had contributed to or caused the cracks. It must be recognized that any admissions on their part that the cracks had developed from inherent structural causes would be against their interests.

It is in this light that we have been obliged to consider Clark's testimony to the effect that the cracks were not caused by drying of wood joists, drying of plaster, structural defects, faulty materials, or faulty work. His opinion to the effect that the cracks could have been caused by an earth tremor or a shifting of the earth under the house which could have caused a settling of a footing, or a "shifting of the foundation," or "a sudden jolt" is not corroborated by testimony of an independent and disinterested architect, contractor, engineer, or any other competent and skilled person. Clark's view simply amounts to denial of any liability on the part of the architects and contractor, and by the process of eliminating all causes which could be related to their responsibilities he assumed that the cracks must have been caused by a movement or shifting of the ground under petitioner's house.

Petitioner relies largely upon Clark's testimony. For the reasons set forth above we are unable to accept Clark's testimony as establishing, under petitioner's burden of proof, that the cracks in the house were caused by a shifting or movement of the earth under the house, or by a subsoil shrinkage or condition, and that they were not caused

by the gradual settling or subsidence of the house, or by faulty materials, faulty work, or the drying of materials.

Petitioner also relies on the testimony of a former employee of the Etchen-Lutz Co., a real estate firm in Toledo, Donald Mortemore, as to the cause of the cracks. His testimony is entitled to very little weight for the following reasons: Mortemore's formal education ended upon graduation from high school in 1941 when he was about 18 years of age. In 1946, after separation from the armed services in November 1945, Mortemore obtained a job as a real estate salesman with the Etchen-Lutz Co. He received a real estate license after taking a 13 weeks' course and an examination. In February 1952, after close to 6 years' experience in the above-named real estate firm, he accompanied an older employee of the firm, William P. Brunson, now deceased, on an inspection of petitioner's house. They visited petitioner's property twice. Brunson, a middle-aged man having 20 years' experience, was in charge of the inspection which was made for the purpose of making an appraisal of petitioner's house and property, and Brunson wrote the letter, dated February 22, 1952, which stated the appraisal. At that time, Mortemore's experience in making appraisals was not extensive and such appraisal work as he had done usually was done under the supervision of an older person having more experience. At that time, also, Mortemore's experience in connection with the construction of houses was not extensive and was of the type which is related to the selling of houses.

At the trial of this case, Mortemore was asked if he had an opinion as to the cause of the cracks in petitioner's house as well as why Brunson had stated in his appraisal that the petitioner's property had depreciated due to "slippage" of land toward the river. Mortemore stated that his knowledge of slippage of land was based upon publicity in newspapers and conversation, which he heard, by people who were neighbors of petitioner. Objection was made to Mortemore's expression of an opinion about the cause of the cracks in petitioner's house. The objection was sustained.

Attached to petitioner's income tax return for the taxable year is a clipping from a newspaper, the Toledo Blade, published on July 28, 1951. The clipping shows pictures of men taking measurements of the slippage of earth on an embankment on the west bank of the Maumee River near the town of Maumee, and it reports that authorities had begun a survey to determine the cause of the slippage. According to the news pictures, the slippage was a few feet. The record in this case shows that in 1951, 1952, and 1953 there was discussion about slippage of earth on embankments above the shore of the Maumee River, about a practice of commercial dredging of sand out of the Maumee River close to the shore, and about the desirability

of zoning the shore area of the river to extend the residential zone down to the shore. However, neither the clipping, above mentioned, nor the record before us establishes that the slippage of earth on embankments above the shore of the river occurred on or near the petitioner's property, which is at some point "near" the town of Maumee, the distance or nearness not being defined.

In his testimony, petitioner expressed the opinion that the cracks in his house were due to the slipping or dropping of the embankment at the rear of his house. Upon a careful examination of the entire record, it can be concluded only that petitioner's opinion represents no more than an assumption which has been largely influenced by, if not caused by, discussions and newspaper reports about conditions along the shore of the Maumee River, in general.

There is no evidence that on or about October 16, 1951, there was slippage or a dropping of the embankment on the edge of petitioner's property, at the rear of his house, or that at that time there was a movement of the earth under the house. No one has testified that he saw the effects, such as loose earth which had moved or fallen, of any slippage or dropping of the embankment at the edge of petitioner's two lots, such as would be visible if such slippage or dropping had occurred, and there is no other evidence to that effect. Also, there is no satisfactory proof that the land around, under, and close to petitioner's house suffered any noticeable change at or about the time the cracks developed. Petitioner was asked if, when he discovered the cracks in his house, there were any cracks in the land close to his house, to which he replied, "The land looked the same to me," meaning, the land looked the same after as before the cracks in the house appeared. He was unable to say that there were any depressions in the land near his house at the time. Clark testified that before the land was prepared for the construction of the house there were some depressions in the land not to exceed 6 inches, and that after the house had been put up and the cracks had appeared he noticed a depression in the land at the back of the house which was small and did not exceed 4 inches. Whether or not there is any connection between the two, we do not know. At any rate, after the cracks in the house had developed there was no important change which could be noticed in the land around the house.

Petitioner has laid some emphasis on a crack in the foundation on the river side of the house, but Clark did not. This crack, the width of a pencil lead, is not in any respect of such nature as could be described as a severe shearing or breakage in the foundation wall, and it was not sufficiently noticeable as to require repair.

It is noted that there were no cracks in the floors of the house or any tilting, up or down, of the floors.

Although Clark denied that any defects in construction, design, work, or materials, or the shrinkage of materials, or settling could have caused the cracks, he admitted that at some unspecified time after the cracks in question appeared, there was a severe breakage in the stones making a stone terrace in the front of the house. Asked about this, he testified that stones in the terrace broke in half; that the stones had settled; that the entire terrace had to be replaced; and that there was a depression of about 1 foot in the front of the house where the settling and breaking of the stones occurred. Clark stated, too, that he did not think the subsequent breakage of terrace and the cracks involved here were due to the same cause.

Petitioner has never spoken to the contractor, Entenman, about the cracks. He spoke only to the architects. He has never obtained an estimate of the cost of repairing the cracks, and he has not had them repaired. (The repair of the ceiling crack in the living room is a temporary kind of repair.) He gave as his reason for not repairing the cracks that he had a claim for a casualty loss tax deduction pending, that he wanted the cracks to be seen in connection with his claim, and that he saw no reason for "fixing it all up" at his own expense.

Upon consideration of all of the evidence, we are unable to find and hold that there was an identifiable event in October 1951 fixing a point at which an alleged loss to petitioner can be measured, or that there was an identifiable event which was within the meaning of the term "casualty," as that term is used in section 23 (e) (3) of the 1939 Code.

Although our above conclusion disposes of the issue presented, it is concluded, further, that petitioner failed to prove that the damage to his house resulted in a loss of $21,700 for the following reasons:

The general rule is that the measure of a casualty loss on nonbusiness property under section 23 (e) (3) is the difference between the fair market value of the property immediately before and after the casualty, but not in excess of the adjusted basis of the property, and diminished by any compensation derived from insurance or otherwise. *Helvering* v. *Owens*, 305 U. S. 468; *W. F. Harmon*, 13 T. C. 373, 383; I. T. 4032, 1950-2 C. B. 21.

Petitioner arrived at the figure of $21,700 by using, first, the total cost of his house and land, $69,200, which he claims was the fair market value of the property immediately before the alleged casualty, and $47,500, which he claims was the fair market value immediately after. He does not admit receipt of any compensation from any source.

The effect of the general rule is that the loss is measured by the difference of the fair market value before the casualty or adjusted

basis, whichever is lower, and fair market value after the casualty. Adjusted basis with nondepreciable property will generally be original acquisition cost plus any subsequent capital improvements. The adjusted basis of petitioner's property is $69,200, the stipulated cost of the land and building with improvements. Petitioner claims this figure is also the fair market value of the property before the casualty. The reasons advanced are that petitioner incurred the costs shortly before the casualty, that the house was constructed of standard materials, and that it was built by a reputable contractor. Hence, the petitioner argues the total cost represents what an average buyer would be willing to pay. One of the realtors who had appraised the house after the cracks appeared testified that, absent the cracks and the condition causing them, the cost would be representative of its fair market value.

There is nothing in the record to indicate that the realtor, Brunson, had ever made an inspection prior to the cracking, or that he had ever tried to reconstruct its fair market value prior to the damage. The letter of appraisal prepared by the realtor and an associate did not refer to market value before the damage, but merely set forth what the realtors felt the property would sell for on the market. Even if the assumption is made that Mortemore, who assisted Brunson, was fully qualified in this field, and there is much in the record to indicate he was not, some basis for his opinion of the fair market value of the property prior to the damage should have been elicited.

Petitioner contends that no one makes an appraisal in anticipation of a casualty. While this is undoubtedly true, once a casualty has occurred the fair market value of the property before damage may be reconstructed in a number of ways.

Petitioner's cost may be some evidence of fair market value before the damage occurred, if that is the only criterion. *Guggenheim* v. *Rasquin*, 312 U. S. 254. But here there were, at the time the appraisal was made, other sources for establishing the fair market value of petitioner's property in October 1951, before the cracks developed. We are not satisfied that petitioner's cost was equivalent to the fair market value of the property before the damage.

With respect to the appraisal of the fair market value of the property after the cracks developed, it is observed that the appraisers assumed that the cracks were caused by "severe and critical slippage of the land toward the river." The letter of appraisal is as follows:

We feel that the valuation on what otherwise would be an extremely attractive property has been so depreciated due to the severe and critical slippage of the land toward the river that it is worth, in our minds, for a reasonably quick sale, some place between 45,000 (forty-five thousand) dollars and 47,500 (forty-seven thousand five hundred) dollars.

It has been concluded above that petitioner failed to prove the cause of the cracks; he did not prove that they were caused by any subterranean movement of earth, or by any slippage of his land toward the river. Since the opinion of fair market value after the damage appears to have been based primarily upon the assumption that there had been slippage of land, it must be rejected as unsound. Furthermore, there is much in the record which indicates that the appraisers must have known that the purpose of the appraisal was to "file a claim," to use the language of petitioner.

The appraisal was made by an older man, having 20 years' experience, and a younger man who was being trained in the real estate field. The younger man testified in this case that he was not fully qualified at the time the appraisal was made to make the appraisal, and that the letter of appraisal had been drafted by the older man, Brunson. Unfortunately Brunson died before the trial. In his letter of appraisal, Brunson referred to "severe and critical slippage of land toward the river," but he did not state where any slippage had occurred, or that he or anyone hired by him had located slippage anywhere on petitioner's land. Without his explanation of his appraisal, it is of very little value. He might have considered reports of slippage not on Tank's land.

The next inquiry is whether, in any other way, petitioner proved the amount of the alleged loss.

Where a taxpayer is not able to produce proof of value of property, before and after a casualty, we may consider cost of repairs as a measure loss, if there is clear evidence as to the cost of repairs, that such cost was not excessive, and that the repairs did not increase the value of the property. *W. F. Harmon, supra*, p. 383; *Mary Cheney Davis*, 16 B. T. A. 65, 68; *John S. Hall, et al., Executors*, 16 B. T. A. 71. The petitioner moved into his house immediately upon its completion and has resided there ever since. No estimate of the cost of repairs was ever obtained; repairs were not made, except for the temporary repair of one crack which was done by the builder at no cost to the petitioner. Petitioner has suffered no out-of-pocket expense, and he has retained the full beneficial use of his house.

Petitioner must suffer more than a mere paper loss or fluctuation in value; there must be actual loss resulting in damage to or destruction of property. The law does not allow deduction for mere fluctuation in the value of property. *Citizens Bank of Weston*, 28 T. C. 717, 720. Cf. *Harry Johnston Grant, supra*.

It is concluded that petitioner failed to prove by any means that he sustained a loss in any amount. Cf. *Samuel Towers*, 24 T. C. 199; *United States* v. *Koshland*, 208 F. 2d 636.

Respondent's determination is sustained.

*Decision will be entered for respondent.*