George H. Charno, Jr. and Lou H. Charno v. Commissioner.
Charno v. Commissioner
Docket No. 5149-66.
United States Tax Court
T.C. Memo 1971-22; 1971 Tax Ct. Memo LEXIS 310; 30 T.C.M. (CCH) 99; T.C.M. (RIA) 71022; January 28, 1971, Filed. Kenneth Cohn, Lathrop Bldg., Kansas City, Mo., for the petitioners. Rex A. Guest, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies in petitioners' Federal income taxes for the years 1963 and 1964,in the amounts of 6870.57 and $112.75, respectively. A concession having been made, the only issue remaining for decision is whether certain damage to petitioners' residence in 1963 constituted a casualty loss under section 165(c)(3). [1]
Findings of Fact Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference. Petitioners herein are George H. Charno, Jr. (hereinafter sometimes referred to as George or petitioner) and his wife, Lou H. Charno, who both resided in Kansas City, Missouri, at the time the petition herein was filed. They filed a timely joint Federal income tax return for the taxable year 1963 with the district director of internal revenue, St. Louis District. In February *312 1961 petitioners purchased a house in Kansas City, Missouri, from Mrs. Russell Bray for $38,500. The residence was constructed in 1946 by Robert Seaman, Sr. (hereinafter sometimes referred to as Seaman) and his son. Seaman was not a home builder by trade but rather a lath and plaster contractor who worked almost entirely in connection with commercial construction. Prior to 1946 he had constructed only two other houses. The residence is a two-story, box-like frame house of colonial architecture, with its front and rear sides to the south and north, respectively. A two-story wing is attached to the west side of the main part of the residence, and is set back from the front of the main part by approximately five feet. The main part of the Charno house (excluding the west wing) is approximately 40-feet wide (east-west) and 32-feet deep (north-south). The west wing's dimensions are approximately 20-feet wide (east-west) and 27-feet deep (north-south). In total, there is approximately 1,820 square feet of space on the ground floor of the residence. Attached to the rear of the main part of the house is a two-car garage. A porch, which is seven-feet deep (north-south), fronts on the main *313 part of the house and has six two-story pillars, equally spaced. A 101 large number of trees, a few of which were planted by petitioners, surround the residence. At the time petitioners purchased the house in 1961, it was poorly maintained both inside and out; however, structurally it appeared to be in good condition. There were no cracks on the walls other than hairline cracks. Shortly after purchase, petitioners made substantial improvements to the residence and grounds, expending the sum of $17,495.73 for said improvements. These included the (1) repair and correction of gutters and drains which were out of level or in bad condition; (2) excavation of the earth around the north side of the house to correct undesirable water problems; and (3) addition of drains which run out to the street from the west side of the house. The last two repairs were necessitated by the fact that earth outside the north end of the house sloped toward the rear of the garage causing water to drain toward the house. Petitioners also leveled and sodded the front yard in order to help create the drain surface for water to flow from the west side of the house to the street. The foundation walls *314 of the house extends around the south, north and east perimeter of the main part of the house, and the south, north and west perimeter of the west wing. A foundation wall also extends the entire length of the west side of the main part of the house where the west wing adjoins the main portion. Under the center of the main part of the house is a narrow basement, which extends from the front to the rear of the main part. It is approximately seven-feet wide (eastwest) and has walls approximately sevenfeet high, which also serve as a foundation for the house. Accessible crawl spaces adjoin both sides of the basement and lead under the east and west portions of the main part of the house (not including the west wing). A nonaccessible crawl space exists under the west wing. Both accessible crawl spaces are laced with heat ducts which heat the house by forced hot air emanating from a furnace in the basement. These ducts are not all insulated. The basement walls are approximately six feet below exterior finished grade. The crawl-space walls surrounding the north, east and south sides of the main part of the house immediately to the east of the basement area extend below the exterior finished *315 grade to a depth ranging from 25 inches to 34 inches. The levels below exterior grade of the crawl-space walls surrounding the north, west and south sides of the main part of the house immediately to the west of the basement (excluding the west wing) are unknown. The height of the west-wing's foundation walls on the north, west and south sides is approximately 23 inches, with approximately 15 inches below finished grade. All foundation walls are constructed of unreinforced poured concrete and no footings are placed underneath the walls with the possible exception of the basement walls. The thickness of the basement area walls is approximately 12 inches. The thicknesses of some of the other foundation walls appear to be approximately 12 inches or less. Seaman and his son constructed and placed the forms and poured this entire foundation themselves. They also constructed the subflooring and sheeting of the house on the exterior part in diagonals which brace the house and give it more stability than homes constructed in a different manner. This mode of construction is exceptionally expensive and no longer common. The Building Code of Kansas City, Missouri, in effect as of January 1, 1946, at *316 the time construction of the Charno residence was commenced, contained the following requirements with respect to foundations: PART VII - DETAILED REGULATIONS Chapter 25 - Excavations, Footings and Foundations Sec. 2502. Foundations. General. Except when erected upon hard pan or solid rock or upon walls or piers on the waterfront, foundation walls or other permanent supports shall be carried not less than 3 ft. 6 in. below finished grade and shall rest on solid ground or on leveled rock, or on piles or ranging timbers when solid earth or rock is not found. Exception: Such foundation walls or other permanent supports shall not be required for 1 story buildings of Type IV, V or VI Construction, not exceeding 850 sq. ft. in ground area. Footings. * * * Foundations shall be built upon natural solid ground where possible. Loam or soil containing organic matter shall not be used to support buildings exceeding one story in height. Where solid natural ground does not occur at the foundation depth, such foundations shall be extended 102 down to natural solid ground or piles shall be used, unless there is a practically level fill of good ground which has been in place a sufficient *317 length of time to settle properly, when such fill may be used. * * * Sec. 2505. Foundation Walls. Foundation walls shall be constructed in accordance with the provisions set forth in Chapter 26. Chapter 26 - Walls. Sec. 2603. Foundation Walls. Foundation walls shall be built of approved masonry, reinforced concrete, steel, or iron properly encased, or other approved non-combustible material. When masonry materials are used, they shall meet the requirements to resist frost action in the presence of moisture. In late September or early October 1963, the Charno residence sustained sudden and extensive damage throughout due to differential settlement of the foundation of the house. Since that time no appreciable movement has occurred. At the time of settlement, there was a separation of approximatlely one-half to two inches in the wall and floor of a closet located in a dressing room on the second floor between the study and the master bedroom in the west wing. Cracks also appeared in the dressing room walls and a large crack was evidenced in the floor landing at the head of the stairway leading to the first floor. On the first floor panels in the library also separated and *318 light entered from the outside. Cracks were evident in the basement walls and floor and the wood structure in the attic separated. Throughout the house other cracks and damage occurred. An examination of the residence in 1965 and 1969 revealed damage throughout, some of which has already been mentioned. In the attic there was a one and one-half inch separation at the juncture of the west wing and main part of the house. On the second floor the west wing was separated horizontally from the main part of the house by one and one-half inches - a separation caused by the dropping or settling of the west wing one and one-half inches from the main part of the house. Rooms on the east side of the second floor in the main part of the house revealed damage in the nature of stress cracks, shear cracks and slight separation of moderate degree. The north and south walls of the rooms on the east side of the house had gone down. In the second floor area over the basement, damage in the nature of stress cracks with some degree of shear was present. The first floor over the basement showed the same type of damage. The basement itself evidenced several large cracks in its wall and a large crack *319 in the floor which ran east-west and at one point had a drop of two inches. In the first-floor library in the west wing, the floor at the point of joining with the dining room in the main part of the house, had pulled from under the base as much as a half inch. The west wing had settled approximately one and one-half inches away from the main part of the house. The dining room had various cracks and the living room on the east side had cracks in the walls and at the frames of some windows. The built-in storage cabinets at the north wall of the living room leaned to the north. The six columns on the porch leaned to the east approximately two inches out of plumb. Differential settlement occurs when foundation walls are at different depths and the soil underlying them contracts. In such cases the shallower foundation walls drop before the deeper foundation walls, resulting in strain to and cracks in the structure. Such settlement sometimes results when the foundation does not extend below the frost line. If this occurs frost action causes the ground to swell which, in turn, causes the foundation and its load to heave upward. When the frost leaves the ground the ground has a tendency *320 to lose its supporting strength, causing a downward movement in the foundation. This action occurs every time the frost changes from one level to another and after the frost leaves the ground the structure does not return or rebound to its original position. If part of a foundation underlying a house does not extend below the frost line and another part does, differential settlement occurs. Differential settlement is also caused by loss of moisture content in certain types of soil, resulting in subsidence in the soil. The soil underlying the Charno residence is of such a type. In 1968 examinations revealed that this soil was a highly plastic clay material which had a low moisture content. It was fairly desiccated at the surface and for a few feet thereunder. In addition, the soil was volumetrically unstable and had a tendency to swell or shrink depending on moisture conditions. It also contained 103 organic matter at the surface and for a few feet thereunder. The above-described soil-type consists of very fine particles which have a high percentage of voids between them. These voids are receptacles for large volumes of moisture. When moisture is removed from this soil when *321 it is supporting weight, there is a tendency for the particles to be pushed together, causing the voids to decrease and resulting in a consolidation or shrinkage process in the soil. Should moisture be reintroduced, the soil may expand but normally will not attain more than 25 percent of its original volume. The type of soil herein described is not unusual in the Kansas City area. Various factors affect the moisture content of the soil and the process of desiccation. Predominant factors among these are temperatures, relative humidity of the air and wind velocity. Others include transpiration, the process by which roots of trees and plants will draw water from soil, heat generated by artificial means such as furnaces, boilers and utilities; the amount of rainfall and the height of the water table. (Water table is defined as the surface of free water in the soil measured to the elevation to which it will rise in an observation well with the water being in free contact with the voids of the soil.) Rainfall affects moisture content either through the amount of water it supplies for transpiration or through prevention of a significant moisture drop by continual replenishment. Moisture *322 rises from the water table by capillary action to various levels in the soil, thus providing moisture for the soil. In the Kansas City, Missouri, area local climatological data indicate the following with regard to the total precipitation for each year from 1889 to 1968, the average annual precipitation and the yearly deviation from the annual average computed to that date: Average Annual
Yearly Deviation
Total Annual
Precipitation
From
Year
Precipitation
To Date
Annual Average
1889
38.33
38.33
0
1890
31.82
35.08
- 3.26
1891
37.05
35.73
+ 1.32
1892
43.47
37.66
+ 5.81
1893
32.13
36.56
- 4.43
1894
35.40
36.36
- .96
1895
41.22
37.06
+ 4.16
1896
33.64
36.63
- 2.99
1897
30.21
35.91
- 5.70
1898
50.25
37.35
+ 12.90
1899
32.52
36.91
- 4.39
1900
35.78
36.81
- 1.03
1901
24.76
35.89
- 11.13
1902
40.52
36.22
+ 4.30
1903
39.22
36.42
+ 2.80
1904
47.73
37.12
+ 10.61
1905
42.55
37.44
+ 5.11
1906
32.85
37.19
- 4.34
1907
37.59
37.21
+ .38
1908
39.48
37.32
+ 2.16
1909
40.32
37.47
+ 2.85
1910
37.42
37.46
- .04
1911
31.78
37.22
- 5.44
1912
31.96
37.00
- 5.04
1913
34.99
36.92
- 1.93
1914
43.20
37.16
+ 6.04
1915
47.20
37.53
+ 9.67
1916
42.08
37.69
+ 4.39
1917
29.31
37.40
- 8.09
1918
34.24
37.30
- 3.06
1919
31.23
37.10
- 5.87
1920
41.13
37.23
+ 3.90
1921
40.87
37.34
+ 3.53
1922
31.52
37.17
- 5.65
1923
37.28
37.17
+ .11
1924
33.43
37.07
- 3.64
1925
37.80
37.08
+ .72
1926
34.93
37.03
- 2.10
1927
43.95
37.21
+ 6.74
1928
41.00
37.30
+ 3.70
1929
42.66
37.43
+ 5.23
1930
28.56
37.22
- 8.66
1931
41.15
37.31
+ 3.84
1932
27.07
37.08
- 10.01
1933
27.11
36.86
- 9.75
1934
27.15
36.65
- 9.50
1935
33.86
36.59
- 2.73
1936
21.51
36.27
- 14.76
1937
24.84
36.04
- 11.20
1938
36.97
36.06
+ .91
1939
34.72
36.03
- 1.31
1940
32.55
35.96
- 3.41
1941
46.62
36.16
+ 10.46
1942
41.02
36.25
+ 4.77
1943
27.38
36.09
- 8.71
1944
49.64
36.33
+ 13.31
1945
35.26
36.32
- 1.06
1946
31.56
36.23
- 4.67
1947
46.41
36.41
+ 10.00
1948
30.94
36.32
- 5.38
1949
41.93
36.41
+ 5.52
1950
29.99
36.30
- 6.31
1951
46.22
36.46
+ 9.76
1952
34.61
36.43
- 1.82
1953
20.93
36.19
- 15.26
1954
27.52
36.06
- 8.54
1955
30.66
35.98
- 5.32
1956
25.92
35.83
- 9.91
1957
36.71
35.85
+ .86
1958
39.85
35.90
+ 3.95
1959
38.49
35.94
+ 2.55
1960
32.63
35.89
- 3.26
1961
60.25
36.23
+ 24.02
1962
36.99
36.24
+ .75
1963
24.65
36.08
- 11.43
1964
38.82
36.12
+ 2.70
1965
47.74
36.27
+ 11.47
1966
27.21
36.15
- 8.94
1967
48.69
36.31
+ 12.38
1968
31.96
36.26
- 4.30
*323 104 The total precipitation per month for Kansas City in 1963 taken by the United State Weather Bureau, as compared with the monthly record mean, is as follows: Actual
Variation from
Month
Precipitation, 1963
Record Mean *
record Mean
January
0.59
1.35
-.76
February
0.41
1.53
-1.12
March
1.94
2.61
-.67
April
0.80
3.31
-2.51
May
4.17
4.70
-. 53
June
3.21
4.73
-1.52
July
4.40
3.82
+.58
August
4.08
3.94
+.14
September
1.44
4.17
-2.73
October
0.94
2.80
-1.86
November
2.30
1.89
+.41
December
0.37
1.40
-1.03 105 In their 1963 joint income tax return petitioners deducted a loss of $13,837, due to a claimed casualty resulting from a 1963 drought. Respondent disallowed the loss in his statutory notice of deficiency. Opinion Petitioners' home sustained certain structural damage. They argue that said damage was the direct result of a drought which occurred in the Kansas City area in 1963; and that therefore the loss incurred is a deductible casualty loss within the meaning of section 165(c). [2] Respondent, *324 on the other hand, argues that a drought did not cause the damage to the residence, but rather that the loss was due to a continuous deterioration of the underlying soil and a poorly structured foundation, which made cracks in, and the subsiding of the structure inevitable. Respondent does not contend that there would be no deductible loss if a drought occurred and caused the damage. *325 The trial was replete with graphic data and testimony of expert witnesses concerning the structure of the Charno residence and whether the damage was due to a progressive deterioration in the foundation. Bryan Horner (hereinafter sometimes referred to as Horner), petitioners' first witness, testified that the foundation was adequate. His testimony, however, was largely based on the belief that the builder was George Siemens, a well-known home contractor in Kansas City. Respondent offered testimony from which we have found that the home was built by Robert Seaman, who had had no experience in foundation construction except for his previous construction of two other homes. Aside from petitioner, whose testimony was based on the same false impression, the only other of petitioners' witnesses who testified with regard to the structure of the house's foundation was Leon Maslan (hereinafter sometimes referred to as Maslan), an admittedly expert witness. Much of Maslan's testimony was directed to how well constructed the house was in light of what he considered to be the acceptable practice in 1946, not in light of present-day standards which, Maslan himself admitted, require him to recommend *326 a different mode of foundation design than that of the Charno residence. He testified on direct examination that the foundation was at a proper depth and in keeping with construction practices in 1946. He also stated that the house was well constructed for the time and indicated that diagonal construction of the subflooring and sheeting on the exterior part gave the structure more stability than is normal in today's homes. Maslan personally recommended in 1946, however, that foundations be placed at a depth considerably lower than that of the Charno residence. With regard to lack of footings or reinforcements in the foundation walls, he stated that it was not sound practice and that he would not recommend it today. But both he and Willard S. Norton (hereinafter sometimes referred to as Norton), respondent's expert witness, testified that the lack of footings and reinforcements, which are utilized when soil has poor bearing capacity, was not significant, since the 106 weight bearing capacity of the soil was sufficient to support the weight of the house. In contrast to Maslan, respondent's expert witness Norton considered the foundation to be poorly constructed. He testified *327 succinctly, that: It is bad. I don't believe I can recall offhand except a building that was put up by somebody who was just picking up material here and there and putting them together, have I ever seen anything so badly designed or situated. I would say this, to continue though, comparing this to a foundation designed by any builder who has had experience this has to be the worst. He also contended that the damage was due to a gradual deterioration of the foundation. It is incontestable that the depth of the foundation (on the outside perimeters of the west wing and part of the main portion of the house) did not meet the depth level required by the Kansas City Building Code. The Kansas City Building Code's requirement of 3 feet 6 inches was, according to respondent, established, in part, to assure that foundations in the area were below the frost-line depths, in order to avoid strains and stresses on structure which result from expansion and contraction of soil acting on houses with foundation depths above the line. At trial petitioners disputed that the frost line actually extended below the foundation depths of the Charno residence. They claimed that the requirement of *328 the above Code provision was overly cautious and in support thereof point to the testimony of Maslan that the maximum frost penetration in the Kansas City area was 15 inches. We cannot, however, put much weight on Maslan's assertions, when he admittedly recommended in 1946 that all foundations be at a 36-inch depth, presumably to prevent frost-action damage. Certainly he did not practice what he preached at trial. We find more reliable a data chart prepared by the United States Weather Bureau in 1938, which shows the maximum frost penetration to be from 18 to 35 inches in an area bounded at one point by Kansas City. Also, Norton had observed frost peneration at a depth in excess of 30 inches in Kansas City. In light of these facts and the provisions of the Kansas City Building Code, which we believe to be weighty since there is no evidence that the figures established therein were placed at a meaningless level, we conclude that the foundation perimeter of at least the west wing, which was approximately 15 inches below finished grade, and most probably the foundation perimeter on the main house were not below the depth of frost penetration. The question still remains, however, whether *329 the lack of extension below the frost line caused the damage rather than a drought. In this regard, Maslan testified that the failure of the foundation to go below the frost line and the consequent frost action which might occur did not cause the damage. According to him, the damage would have occurred even if the foundation walls had gone down three and one-half feet, because the true cause of damage was the fact that there was a great differential between the peripheral foundation walls and the deeper foundation walls surrounding the basement. Differential settlement due to frost, moreover, would have occurred in the spring when thawing and freezing occurs and not in the fall when this damage did occur. Norton agreed in part to this when, on cross-examination, he stated that frost action would play a minor role in the deterioration of this foundation. Furthermore, if frost were the cause of the damage it would seem highly probable that there would have been movement after the sudden subsidence in the fall of 1963. This did not occur. The above evidence gives little weight to frost action as a causative factor. We think over the years it can be said that such action did in all probability *330 contribute to a weakening of the foundation and structure but that, as to the sudden damage, frost action was not the cause. Moreover, as of 1963, despite what may have been the structural impediments, the house evidenced no damage and this fact would tend to indicate that the structure was not undergoing progressive deterioration from a faulty structure which either gradually caused the damage or suddenly did. At any rate, we find entirely credible George's statement that the damage was sudden. It is realistically supported by the fact that he spent over $17,000 on improvements after buying the house in 1961. The true structural impediment in the house, both parties agree, was the differential between the outer and inner foundation walls. Such a differential increases the potential for settlement of different portions of the house from drought or frost action. We note that the fact that drought would 107 cause damage which would otherwise have not taken place had the residence been structured differently does not preclude a finding of a casualty loss. Harry Heyn, 46 T.C. 302 (1966). Cf. Matheson v. Commissioner, 54 F. 2d 537 (C.A. 2, 1931), affirming *331 [Dec.c. 5732] 18 B.T.A. 674 (1930). Both parties are in essential agreement about most of the basic qualities of the soil underlying the Charno residence. It is highly unstable and subject to shrinkage if the moisture in the soil is withdrawn and that soil is under pressure from above. Respondent contends, however, that said soil could not have been significantly affected by rainfall in 1963. He points to the testimony of Murray B. Blume (hereinafter sometimes referred to as Blume), his expert in soil analysis, that the soil at the surface and for a few feet thereunder was highly desiccated and would have to be inundated to cause an increase in moisture. He also points to Blume's testimony that the amount of rainfall would not have a significant effect on the soil's desiccation, which is a continuous process. Therefore, according to respondent, it would follow that the soil was in such a state of desiccation that significant shrinkage could not occur. We do not agree. As we interpret Blume's analysis of the effect on the soil of a below average rainfall, it related to desiccation and possible shrinkage of the soil at the surface and immediate subsurface. Significantly, *332 Blume himself agreed that the changes in the soil which affect a foundation occur below that foundation. In this regard, it should be noted that there was a large crack in the basement floor with a 2-inch drop at one point, indicating that significant subsidence took place in the soil below the foundation walls of the basement. We find it hard to believe that part of Blume's testimony upon which respondent relies for his basic proposition. Blume's assertion that desiccation is continuous unless this soil is inundated, and thus that rainfall could have no effect, would lead to the fallacious conclusion that this soil has been losing water since the "year one" and should have been totally desiccated long before the year in issue. In another not wholly unrelated respect Blume's testimony presents problems for us. He testified, contrary to Maslan, that the soil was a type through which water would not rise by capillary action from the water table below. He also indicated indirectly on cross-examination that the soil at the surface and thereunder would not retain significant amounts of water and was relatively impermeable. [3] This testimony would lead to the conclusion that water would *333 not reach the soil between the water table level (which is unknown but definitely below 15 feet) and the surface, since moisture due to rainfall would not permeate from the surface downward or water rise from the water table below. Admittedly, however, the soil a few feet below the surface is not desiccated and has a water content. It would follow that the water at the lower depths has been there for a considerable period of time. *334 We find that this soil could be, and was, significantly affected by loss of moisture due to lack of rainfall, both at the surface and, more importantly, below. This accepted, the overriding fact [4] in this record is that in 1963 there was the third lowest amount of rainfall recorded in Kansas City since 1888, ample evidence to term the 108 climatic condition in that year a drought. At the same time, the Charno residence, which formerly evidenced no structural damage, sustained sudden and extensive damage due to differential settlement in the fall of the year, immediately following the drymonths of spring and summer and before any freezing and thawing occurred. *335 In light of the facts that the soil underlying the residence is unstable and subject to shrinkage due to moisture loss; that the basement floor crack and other cracks evidence that soil subsidence did occur; and that we have found that the damage was not the result of frost action or a gradual deterioration of the foundation, the conclusion must follow inescapably, and we so hold, that a drought caused the damage to the residence. Lack of water reaching the soil by whatever means caused the soil to shrink and the resulting damage followed. The only remaining issue to be decided is the amount of loss suffered by petitioners. Under section 1.165-7(a)(2), Income Tax Regs., [5] the amount of loss is generally determined by the difference between the fair market value of the property immediately before and after the casualty. This is the case here. *336 Petitioners' witness Horner testified that the fair market value of the residence immediately before and after the casualty was $55,000 and $42,500, respectively. His estimates were made in retrospect, since they were based upon an examination of the house in 1964 after the damage had occurred. In arriving at the $55,000 figure, he considered the purchase price of the home and the extensive improvements which had been made by petitioner. As to the $42,500 figure, he based it upon two factors. [6] In this regard he stated: The first is that the damage to the residence was considerable. It had obviously been under some tension and had been twisted because there were serious cracks and faults appearing throughout, and my second basis is that we have operating in this market a very considerable reluctance by people, because of the high incidence of drought damage, to have anything to do with a house that is showing such an apparent settlement problem. They turn and go straight out the door. *337 Honer was familiar with this residence since he had sold it to petitioners. He also had been a real estate agent in the Kansas City area for many years and had a considerable amount of experience. However, his estimates were made retrospectively. Moreover, he based his pre-damage figure on the fallacious belief that George Siemens, a well-known contractor, built the home and this obviously makes it too high. We doubt, however, that his misconception affects to any great extent the validity of the post-damage estimate, since the fact that the house had evidenced extensive damage would nullify the effects of his belief that the home was well constructed due to the reputation of George Siemens. Considering his testimony, the initial cost of the residence, the improvements made thereto and all other factors in the record, we hold that the fair market value of the residence prior to the damage was $49,200. After the event, considering the considerable damage to the 109 residence and all other record factors, the fair market value was $41,100. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). Accordingly, the casualty loss is $8,100. Decision will be entered under *338 Rule 50. Footnotes
1. All statutory references are to the Code of 1954 unless otherwise indicated.↩
*. Record mean precipitation figures are long-term means for the period beginning in 1889.↩
2. SEC. 165. LOSSES. * * * (c) Limitation on Losses of Individuals. -in the case of an individual, the deduction under subsection (a) shall be limited to - (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. No loss described in this paragraph shall be allowed if, at the time of filing the return, such loss has been claimed for estate tax purposes in the estate tax return.↩
3. Q. Well, in the summertime, say there is a lack of rainfall, lack of precipitation which may happen in the summertime, vegetation seems to prosper, it may if there is a sufficient lack it may start to wilt and possibly die? A. Yes. Q. If we took a garden hose and water it wouldn't it possibly revive the plants? A. Yes, sir. Q. Which means you are getting water down to that root system? A. Yes, sir, you are recharging it. Q. Rainfall obviously performs the very same function as a garden hose? A. Yes, for roots that are close to the surface. Q. This could even be large trees, couldn't it? A. The precipitation or artificial watering wouldn't be able to recharge roots that were under an impermeable surface. Generally agriculturalist will till the soil and aerate it to permit passage of water. Q. If we get a heavy rainfall on this type of soil where does the water go? A. If we have reasonable drainage it will drain over into the street gutter. Q. The ground will not absorb it? A. Just a limited amount probably in the organic top soil will absorb a reasonable amount to water the grass.↩
4. Respondent noted on brief as a further possible cause of the damage that a new drainage system for the residence was constructed and may have prevented significant amounts of water from reaching the soil. Maslan, however, testified that this was not significant and we so find. Respondent also noted that some of the pipe ducts under the house were uninsulated and may have caused moisture loss. We simply cannot believe that this was in any way significant, especially since the ducts apparently had been uninsulated for many years and no damage had occurred.↩
5. Sec. 1.165-7 Casualty losses. - * * * (2) Method of valuation. (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. This appraisal must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property. (ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the causalty.↩
6. Horner's estimate of the fair market value of the house after the damage took into account buyer reluctance to purchase the house due to the fact it had evidenced extensive settlement damage. This factor is quite different from the pure psychological resistance to the purchase of any property in an area due to particular occurrences such as prior floods or land slides which uniformly decrease the fair market value of all property. The latter sort of resistance may not be taken into account in determining the extent of the casualty loss. Joe B. Thornton, 47 T.C. 1 (1966); Squirt Co., 51 T.C. 543 (1969), affirmed per curiam 423 F. 2d 710 (C.A. 9, 1970); Clarence A. Peterson, 30 T.C. 660 (1958); Harvey Pulvers, 48 T.C. 245 (1967), affirmed per curiam 407 F. 2d 838↩ (C.A. 9, 1969).