## ROOKWOOD POTTERY CO. v. COMMIS-SIONER OF INTERNAL REVENUE.

### No. 5375.

Circuit Court of Appeals, Sixth Circuit.

Nov. 12, 1930.

Robert Taft, of Cincinnati, Ohio (Taft, Stettinius & Hollister, of Cincinnati, Ohio, on the brief), for petitioner.

J. G. Remey, of Washington, D. C. (G. A. Youngquist, Asst. Atty. Gen., and Sewall Key, C. M. Charest, and Robt. L. Williams, all of Washington, D. C., on the brief), for respondent.

Before DENISON, HICKS, and HICKENLOOPER, Circuit Judges.

DENISON, Circuit Judge.

For several years prior to 1890, the Rookwood Pottery, at Cincinnati, had been developing the production of highly artistic pottery and, from a stage which at first was experimental and of the laboratory character, had progressed toward a commercial enterprise. In 1890, it was fairly established, and had become enough of a commercial success to be self-supporting. The enterprise, then a private association or partnership, had acquired patents upon processes, and had a registered trade-mark and a good will, in the senses that, under its trade-name and trade-mark, it had taken many awards and prizes in exhibitions, and had acquired a reputation as a leader in its line in the United States—indeed, was almost unique—and that a substantial and increasing market for its wares had been created. In 1890 it was incorporated, with a capital stock of $50,000, said to be all paid in. All the tangible assets of the existing enterprise were inventoried at about $24,000; the intangible assets (trade-mark, patents, and good will) were called worth about $16,000; and $40,000 of the stock was issued, as fully paid, to the existing owners. The remaining $10,000 of the stock was sold for cash, at par, to Cincinnati purchasers, in order to provide working capital. From that time on, the business greatly prospered. It carried on its books this $16,000 item for intangibles as a capital stock investment. After four years, in view of an accumulation or surplus of substantial profits each year, the directors thought best to and did charge off this item of intangibles, and it did not thereafter appear on the books as a part of the capital investment. In making its profit returns for the years 1921 and 1922, the company considered this $16,000 as invested capital; the commissioner held that it was not, and increased the tax accordingly; the Board of Tax Appeals affirmed the commissioner; and the taxpayer now presents this appeal.

Section 326(a) of the Revenue Act of 1921 (42 Stat. 274) provides that there may be included in "invested capital," among other items, the following: "(4) Intangible property bona fide paid in for stock or shares prior to March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in. * * * *" In aid of uniformity in determining the cash value of such intangibles, the department adopted a regulation, which is copied in the margin.[1]

Consideration of the question involved should begin by observing that the taxpayer had before the commissioner and has, on appeal, the burden of proof upon its proposition that these intangibles, in 1890, fairly had an actual value of $16,000. Considerable proof to that end was introduced. The Board of Tax Appeals has made no definite finding that these assets did not have this value, or that the fair value was some smaller sum. It has contented itself with holding that the taxpayer has not sufficiently proved its proposition. In such a situation, cases may well arise where, in spite of its negative form, the con-

---

[1] "Art. 851—Tr. Reg. 62. Intangible property paid in.—The actual cash value of intangible property paid in for stock or shares must be determined in the light of the facts in each case. Among the factors to be considered are (a) the earnings attributable to such intangible assets while in the hands of the predecessor owner; (b) the earnings of the corporation attributable to the intangible assets after the date of their acquisition; (c) representative sales of the stock of the corporation at or about the date of the acquisition of the intangible assets; and (d) any cash offers for the purchase of the business, including the intangible property, at or about the time of its acquisition. A corporation claiming a value for intangible property paid in for stock or shares should file with its return a full statement of the facts relating to such valuation."

clusion of the board would have the character of a finding of fact; but here we think it clear that a question of law is involved. The opinion of the board shows that it regarded the taxpayer as under the legal burden of proving this value "with certainty"; and upon this basis it concluded that uncertainty remained. In this premise, we think the board was in error. We see no reason why the taxpayer did not make its case when it put in proofs clearly and distinctly tending to show this value; and when the proofs so introduced remained unchallenged by contrary proofs or by destructive analysis, it was the duty of the commissioner to decide the issue in accordance with the proof then appearing before him; and it was, we think, the duty of the board to take the same view. The Blackstonian "certainty to a common intent" ought to be sufficient.

Returning to the actual proofs: In the nature of things certainty was impossible. The transaction occurred more than twenty-five years before; most of those actively engaged were dead; the books and records of the original enterprise and of the early years of the corporate business were mostly lost or destroyed. There was no doubt that these patents and this registered trade-mark existed in 1890, and that a very high reputation for the product had been established. The enterprise had become substantially self-supporting; and this does not happen in this kind of manufacture until after the product has made a place in the market. That kind of reputation and success is good will. The decision of the board assumes that there could have been no good will if there had been no net profits. This is clearly wrong; many an enterprise has been, by its good will, sustained and carried through a non-profit period. It is thus clear to us that these intangibles had a real and substantial value; and the only question is: How much?

They might well have been appraised at a high figure, as shown by the subsequent history. The later success upon a large scale was doubtless built, in great degree, upon the foundation of these intangibles; it had little other base. Instead of appraising at some optimistic figure, as would have been done by less conservative organizers, these people fixed the valuation at $16,000. The law of Ohio, doubtless familiar to the organizers and their counsel, permitted property to be used in payment for stock only at the actual cash value of the property, and these organizers and their advisers cannot now be presumed to have intended a violation of this law. The

contemporaneous sale of the remainder of the capital stock, for cash, at par, confirmed this valuation. Every one who purchased any of this stock thereby acquiesced in this appraisal of these intangibles; it was only this appraisal that gave this additional capital stock the par value at which it was sold on the market. Upon the whole, we cannot doubt that the "earnings attributable to such intangible assets while in the hands of the predecessor owners," the "earnings of the corporation attributable to the intangible assets after the date of their acquisition," and "representative sales of the stock at about the date of the acquisition" made up sufficient evidence to meet whatever burden of proof may rest upon this taxpayer, and to justify and require the inclusion of this amount in "invested capital."

■ The facts appearing as they do, it becomes of negligible importance that the directors had not continued to carry these intangibles as an asset on the books. That fact is no more important here than it would be if the corporation had paid for the intangibles in cash instead of in stock. The cutting out of this class of assets from the capital stock account was in accord with the best and most prudent practice of the time.

■ For the years 1923, 1924, 1925, and 1926 another question arises. The amount of profits each year cannot be completely determined without comparing the beginning and the closing inventories. This company was unique, in its commercial as well as in its artistic methods. It undertook—as all agree it should do—to make these inventories upon a cost basis; but there were great practical difficulties. The cost of individual pieces could not be kept; a great proportion of them developed into failures somewhere in the process; and the cost of these, as well as the more general overhead, must be apportioned. When the individual article was finished, its selling value, depending as it did upon individual qualities, could not be based upon cost, and the practice was for the department head to mark upon it what he thought the proper selling retail price. The goods when finished were not sold to wholesale or retail dealers. They were placed with retailers throughout the country upon consignment, and were invoiced and accounted for upon the basis of this marked selling price. The dealers accounted for each article when sold, and from time to time returned the articles which did not sell in their locality. These articles would then be sent to other dealers, or might remain for a time at the

factory. It would therefore, at all times, happen that the factory stock contained some new articles which had never been sent out, and some returned articles waiting reconsignment, and these returned articles would be one, two or three years old, as the case might be. The stock in the hands of dealers would have the same characteristics, varying from articles just received to those which had been in stock for some time.

The company's records show, for each year, the selling value of the total product made that year and the total cost thereof. Thus the selling value inventory could be reduced to a cost value inventory. This method was applied, in detail, each year, to the stock on-hand at the factory; and it was feasible, as each article was stamped with the production year as well as with the value. This method of making the factory inventory is accepted as correct.

Prior to 1927, the factory did not keep a record of the year of manufacture of the articles out on consignment, so that it was impossible for it to make up this cost inventory of consigned goods on an absolutely accurate basis; but it adopted what it considered the closest possible approximation. It apportioned the consignment goods among the different manufacturing years upon the same basis shown by the stock at the factory. It thus concluded that of the goods in the possession of a particular consignee, 30 per cent. were of the last year, 30 per cent. of the year before, and 20 per cent. of each of the two earlier years—or whatever proportions the factory inventory might indicate. This was important, because the percentage of cost for each year must be applied to the selling value of the total for that year, and because this percentage was rapidly changing and increasing. These cost percentages were approximately: For 1923, 31 per cent.; for 1924, 37 per cent.; for 1925, 44 per cent.; and for 1926, 58 per cent.; and when the taxpayer took its selling value inventory at the end of 1926 ($564,-000) and apportioned the consignment goods to the various years in accordance with its method, and applied to each year's product the cost percentage for that year, it produced a cost value inventory of about $194,-000. The commissioner, however, applied to this entire final inventory of 1926, the cost proportion for the year 1926, and found a cost value inventory of $325,000—a difference of $131,000. There was a similar comparative appraisal at the beginning of the year, and as the percentage figure for 1926 had been 58 per cent. and for 1925 only 44 per cent., the gain in inventory during 1926 was, by the commissioner's figures, increased $67,-000 over the taxpayer's figures. Owing to the constantly increasing cost proportion during these four years, the total income increase made by the commissioner is about $120,000. The controlling question in any such problem as between two methods is: which more truly reflects the income? It is recognized, of course, that income many times cannot be accurately stated. It can only be, in the language of the statute, "reflected." If, as between two possible methods, it were a matter of uncertainty which gave the truer reflection, it would be within the discretion of the commissioner to choose; and we would not and could not review that discretion. We think this is not a case of such uncertainty; but that, quite clearly, the method used by the taxpayer gives the truer reflection. Comparing the two here, we see that the taxpayer's method may be substantially accurate in every respect. No one can say that it is not. The stock in the hands of the consignee may not be in the same proportion as the stock in the factory, but taking all the consignees together, why would it not be? The method presents an intelligible and fairly logical, and probably an approximately correct, result. It was doubtless adopted in good faith by the taxpayer in an effort to get at the best method of representing the truth to its stockholders, and it should not be discarded unless it is essentially wrong—not merely because it may not be exactly right.

On the other hand, the method of the commissioner is demonstrably and always wrong. The stock in the hands of every consignee is made up of the product of several years. To reach its cost upon the basis of the cost for the last year, the highest year of the period, brings a result which is plainly erroneous, and cannot possibly truly reflect the income.

We think it was not within the discretion of the commissioner to reject the method which was doubtless approximately correct, and perhaps almost exactly right, and adopt a method which was certainly wrong.

The order of the Board of Tax Appeals is reversed; and the case remanded for appropriate further proceedings.