Raymond TANK and Elizabeth Tank, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 13603.

United States Court of Appeals
Sixth Circuit.

Sept. 18, 1959.

G. Charles Scharfy, Toledo, Ohio (Robert Kniffin, Toledo, Ohio, on the brief), for petitioners.

Joseph Kovner, Dept. of Justice, Washington, D. C. (Charles K. Rice, Lee A. Jackson, A. F. Prescott and Davis W. Morton, Jr., U. S. Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before ALLEN and McALLISTER, Circuit Judges, and THORNTON, District Judge.

THORNTON, District Judge.

This matter involves a tax deficiency of $11,140.63 resulting primarily from the disallowance of a casualty loss claimed by petitioners on their personal in-

come tax for the year 1951. The Tax Court upheld the Commissioner's determination disallowing the casualty loss, and decided that the petitioners owed the deficiency. The matter is here on a petition for review of the action taken by the Tax Court. The stipulation of the parties, plus the exhibits and testimony below, portray the following picture:

Petitioners are husband and wife who, since May 1952, have resided at 4327 River Road, Toledo, Ohio; during the years 1950–1951 they acquired two residential lots situated on West River Road near Maumee, Ohio, lying between the road and the Maumee River. The cost was $21,000. Said property with its riparian rights, access to the river, and a beautiful view of the river valley, is highly desirable residential property. Subsequent to this purchase they had plans drawn for a 2-bedroom ranch type home to be erected on these lots, the plans being drawn by Karl B. Hoke and his associate Robert Clark, both being registered architects and licensed to practice their profession in Ohio. The petitioners then entered into a construction contract with Fred W. Entenman, a general contractor, for the construction of their home according to the plans. This contract was executed on April 27, 1951, construction commenced on May 16, 1951 and continued until the early part of 1952. However, by the middle of October 1951 the construction of the home was substantially completed. All that was left to be done was the installation of lighting fixtures and carpeting. The plans and specifications for this home complied with or were superior to the recommendations of the American Institute of Architects, and also complied with local county and state building codes. The workmanship of the contractor and his workers was in accordance with the plans and specifications of the architects. The materials used in the construction of the home were of good grade and did not include any rare, exotic or unusual items, but consisted of materials which were standard and readily available in the Toledo market.

Petitioners' capital cost of their residence amounted to $69,200 apportioned as follows:

Cost of land ............$21,000.00
Payments to contractor .. 43,372.29
Other capital costs ...... 4,827.71

Mr. Robert Clark, the architect who personally drew up and supervised the completed sketches, drawings and specifications for this home, supervised the actual construction by visiting the site frequently, the frequency varying from daily visits during active construction periods to weekly visits during the least active periods. The petitioners visited the site every day for the purpose of observing the progress of the construction.

On the visit made by petitioners on October 16, 1951 they observed that their home had been damaged. Whatever was the cause must have occurred suddenly and without warning since there was no evidence of damage on the preceding day when the home was visited by the petitioners. The evidence of the damage that was apparent to petitioners on this day consisted of the following:

(a) Crack in the living room ceiling plaster ½ inch wide and 27 feet long;

(b) Two cracks in dining room ceiling plaster ¼ to ½ inch wide and 12 to 14 feet long;

(c) Fireplace pulled away from wall and sank, creating crack from ceiling to floor approximately ½ inch wide;

(d) Large crack in wall of living room at the entrance to the bedroom hallway;

(e) Two cracks in bedroom ceiling plaster;

(f) Crack in reinforced concrete back porch sill;

(g) Foundation shearing on side of house facing river;

(h) Crack in living room wall to left of bookcase extending from bookcase to ceiling, approximately ¼ to ³⁄₁₆ inch wide;

(i) Crack in the tile in master bath shower.

The existence and extent of the above damage was verified and corroborated by petitioners' supervising architect, Mr. Clark, and one of the appraisers, Donald Mortemore, who was retained to estimate the effect of the damage on the value of the residence. In a letter to Mr. Tank from the appraisers, Mr. Brunson and Mr. Mortemore, dated February 22, 1952, the following appears:

"We feel that the valuation on what otherwise would be an extremely attractive property has been so depreciated due to the severe and critical slippage of the land toward the river that it is worth, in our minds, for a reasonably quick sale, some place between 45,000 (forty-five thousand) dollars and 47,500 (forty-seven thousand five hundred) dollars." [1]

Prior to the time petitioners purchased the lots and commenced construction of their home, they had no reason to expect or believe that any such damage might result from the building of a residence at that particular location. There had been no prior newspaper or other type of publicity concerning other property in the vicinity sustaining damage due to slippage of the river bank.

After October 1951 there was newspaper publicity concerning sand suckers removing sand from the river bottom, and residents along the river bank complained about their riverside property slipping and settling. Petitioners personally observed the slippage to nearby river properties by cruising up and down the river in their motor boat and Petitioner Raymond Tank was one of a number of people who signed a petition to restrict the operation of the river sand suckers, since he and the other residents in the area believed such sand suckers were causing or contributing to the river bank slippage. The petitioners herein based their claim for casualty loss on the provisions of Section 23(e) (3) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 23(a) (3), which is applicable to the year in question and which provides as follows:

"§ 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

"(e) Losses by individuals.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

\* \* \* \* \* \*

"(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty,[2] or from theft. No loss shall be allowed as a deduction under this paragraph if at the time of the filing of the return such loss has been claimed as a deduction for estate tax purposes in the estate tax return."

The question presented to the Tax Court then was whether or not the loss suffered by petitioners due to the decreased value in their house, under the circumstances here present, was a loss of property arising from some "other casualty." The Tax Court found against petitioners. The contention of the petitioners was, and is, that the damage sustained by them resulted in a deductible loss within the purview of the term "other casualty" set out in the foregoing statute. They further contend that their casualty loss was deductible because—

(1) In that year externally-evidenced physical damages were incurred.

(2) Such damages occurred suddenly and without previous warning.

(3) The cause of such damages was not an ordinary cause.

(4) The cause was a sudden movement, tremor or shifting of the land underlying the residence.

1. Petitioners' Exhibit 5.

2. Emphasis supplied.

(5) As a result of such damages, the fair market value of the property was diminished from $69,200 to not more than $47,500.

(6) The damages were not due to any fault or negligence of petitioners or their agents.

(7) Petitioners have not been reimbursed by insurance or otherwise for such loss to the fair market value of their property.

They here contend that the determination of the Tax Court in upholding the Commissioner's ruling disallowing the casualty loss and deciding that the petitioners owed a deficiency of $11,140.63 rests upon an incorrect appraisal of the facts and upon conclusions that are clearly erroneous. If such be the case, then we may not affirm the Tax Court's ruling. There must be "warrant in the record." [3]

At the trial before the Tax Court the Commissioner offered no defense, so that the facts as adduced at this trial are uncontroverted. The petitioners here complain that the trial judge appeared to express concern over negative proof—testimony of witnesses who might have been, or were not called, the failure to present evidence concerning certain matters, the things which were not done—that the trial judge has completely and, in the opinion of the petitioners, unjustifiably overlooked or ignored the uncontroverted proof which was offered and received in evidence. The petitioners further assert that a comparison of the Tax Court's Findings with the Official Report of Proceedings before the Tax Court will reveal in striking fashion the Tax Court's disregard of much of the evidence, almost all of which was not questioned, except by the Tax Court, as the Tax Court conducted most of the direct examination and most of the cross-examination of the witnesses.

With reference to testimony offered by the taxpayers, the Tax Court states: [4]

"The supervising architect, Clark, testified as follows:

" 'There was something wrong. At that time we honestly did not know what caused it.'

Clark and the contractor examined the house and the property immediately after petitioner notified the architects of the development of the cracks. The record indicates that their examination consisted of no more than looking at the house and the land. They did not make any opening in the earth around the foundation walls, or under the house, or anywhere on the property. They did not make an exhaustive or even a diligent investigation to try to find out what had caused the cracks, and petitioner did not do so either. Neither petitioner nor those who were then responsible for constructing the house and turning it over to the owner in first class condition, sought or engaged a competent expert in matters of the kind which were involved. No competent, independent, disinterested person having technical training, and experience, such as an engineer, or geologist, or any independent person having particular knowledge about structural design, tensions, materials, weight distribution, or subsurface conditions of earth, or such matters was employed to examine the property to determine the cause of the cracks. Clark advised a wait-and-see policy, and so petitioner waited and he continued to do that for 6 years. No other cracks developed and the proximate cause of the cracks was never ascertained in any objective and disinterested way. The contractor was not called to testify; only Clark gave testimony. Although he is a graduate, licensed architect and, therefore, must be regarded as competent, he was the supervising architect, and his opinions must be considered

---

3. Dobson v. Commissioner, 320 U.S. 489, 501, 64 S.Ct. 239, 88 L.Ed. 248.

4. Findings of Fact and Opinion as set forth at page 119a of Brief and Appendix of Petitioners on Review.

along with the fact that his firm and that of the contractor were working together on the construction of the house and both had the self-serving interest which those under contract must have. They were in the position of having to bear the cost of repairs or the payment of damages if their negligence, omissions, or faulty work had contributed to or caused the cracks. It must be recognized that any admissions on their part that the cracks had developed from inherent structural causes would be against their interests. It is in this light that we have been obliged to consider Clark's testimony to the effect that the cracks were not caused by drying of wood joists, drying of plaster, structural defects, faulty materials, or faulty work. His opinion to the effect that the cracks could have been caused by an earth tremor or a shifting of the earth under the house which could have caused a settling of a footing, or a 'shifting of the foundation,' or 'a sudden jolt' is not corroborated by testimony of an independent and disinterested architect, contractor, engineer, or any other competent and skilled person. Clark's view simply amounts to denial of any liability on the part of the architects and contractor, and by the process of eliminating all causes which could be related to their responsibilities he assumed that the cracks must have been caused by a movement or shifting of the ground under petitioner's house."

The making of an analysis or diagnosis through the process of elimination is a familiar one to scientists engaged in the fields of chemistry, medicine, electronics, engineering and the various related areas. Clark's utilization of this well established scientific procedure serves, in our opinion, only to confirm, or reinforce, his qualification as an expert.

The uncontroverted testimony discloses the following:

Mr. Clark, the architect who designed the home and supervised its erection, is a graduate of the University of Michigan, having graduated in 1941 with a degree of Bachelor of Science, and majored in architecture. For 2 years after graduation he worked at various war projects as an architect and architectural engineer. Thereafter, for a year and a half, he worked in the research laboratory of General Motors doing design work for the laboratory building which is part of the General Motors Technical Center near Detroit, Michigan. In 1946 Mr. Clark became associated with Mr. Karl B. Hoke, a Toledo architect, and was made a partner in this firm in 1954. In addition to being licensed to practice architecture in Ohio, Mr. Clark is a member of the American Institute of Architects. Mr. Hoke's architectural firm is engaged in institutional, industrial, commercial and residential architectural work. Prior to Mr. Clark's work on petitioners' residence, as an architect he had personally drawn plans for, or supervised construction of 75 to 100 homes, and his work required a general knowledge of, and familiarity with, structural engineering. In preparing the plans and specifications for petitioners' residence, Mr. Clark took into consideration the location of the house with respect to the river bank. Soil tests were made to determine the condition and composition of the soil and stability of the river bank in that locality. The bank was examined, its slope, contour and vegetation studied and exploratory diggings made; the house was built approximately 8 to 10 feet from the edge of the bank which sloped at an angle down toward the river; the river bank, at that location, sloped at an angle of approximately $22\frac{1}{2}\%$ to $30\%$ down toward the river, the house being at an elevation of approximately 35 to 40 feet above the river, and approximately 98 feet back from the edge of the river; petitioners' home was not what is known as a slab type of residence where the floor is entirely made of concrete, but was built upon foundation walls extending around the entire perimeter of the house and under all non-load-bearing walls as well as load-

bearing walls. Based upon his research, Mr. Clark drew up the specifications for the house and with particular reference to its foundations and footings specified reinforcing procedures which were considered more than adequate for the construction of this house, they being as follows:

(a) The footers were located on undisturbed virgin soil, not fill dirt.

(b) The footers were designed wider and deeper than normal, and reinforced with 3 or more ¾" reinforced rods.

(c) The footers and reinforcing rods terminated in 2 massive "lugs" or masses of reinforced concrete with dimensions of 5' x 4' x 3'.

(d) Extreme safety ratios relating to the load-bearing capacity of the earth were specified for all footers and the fireplace support.

Petitioners' home is considered a "light" house insofar as weight is concerned. It is of one-floor construction, its load upon the ground per lineal foot being approximately 1370 pounds. The building code for the extremely hard clay upon which the house rests allows 6 tons (12,000 pounds) of pressure. The result is a safety factor of 1370 as compared with 12,000, or a ratio of almost 10 to 1. Upon being informed by petitioners of the numerous cracks and openings which occurred in October of 1951, Mr. Clark and a contractor personally visited the site and examined the damage, and, in addition to the numerous plaster and foundation cracks, Mr. Clark also observed a depression of approximately 4 inches in the land at the back of the house. The rapid drying of plaster or shrinkage of wood under plaster may cause hairline cracks; the cracks which occurred to petitioners' residence, with one exception, were not hairline cracks— they were not the result of any structural defect, faulty workmanship, design or materials, or too rapid drying of materials.[5] The pulling away from the wall and sinking of the stone fireplace could not have been caused by the weight of the stone in the fireplace, since the fireplace footers were designed to carry many times the weight of the stone chimney. Mr. Clark testified that in all of his experience he had never observed cracks of the size and magnitude which occurred in petitioners' home. The architects recommended against immediate repairing of the cracks since they knew that there was something definitely wrong; there were too many cracks occurring too suddenly to have been caused by ordinary shrinkage of lumber or excessive drying; consequently the largest crack was repaired on a temporary basis until the cause of the damage to the home could be determined; in the opinion of the architect the cracks were caused by the shifting of the ground under the house. Since extreme precautions had been taken to prevent any normal settling of the foundation, the settling or shifting of the foundation or footers was caused by an earth tremor or other sudden earth jarring or movement;[6] in addition to Mr. Clark's examination of the site his firm checked with consulting engineers and other architects. The plans and specifications of the architects for petitioners' residence included every precaution to prevent slippage or sliding, even above and beyond what other architects in Toledo were doing.

"Casualty", as used in the statute here involved has, on numerous occasions, been defined as an accident resulting from an unknown cause and occurring unexpectedly, suddenly, without being foreseen and without design.[7] It appears to us that the instant mishap comes precisely within the concept of "casualty" as illuminated by the cases.[8] The possibility that this was an anticipated event that was planned and was

5. According to the uncontroverted testimony.

6. From the uncontroverted testimony.

7. and 8. See Fay v. Helvering, 2 Cir., 120 F.2d 253; Matheson v. Commissioner of Internal Revenue, 2 Cir., 54 F.2d 537; 5 Mertens' Law of Federal Income Taxation, § 28.57.

foreseen and was due to a progressive deterioration, for example, is so remote as to be as completely non-existent as a possibility can be. It is thoroughly negatived by all the evidence presented at the trial of this case. The testimony of the witnesses was not only uncontroverted but was unequivocal. In this connection the view of the petitioner, as indicated by the following testimony, is enlightening:

"The Court: Well, finish it. They did what? They took all what?

"The Witness: Well, they took all provisions to build a good home. What I mean, Fred Entenman is one of the best contractors in the City of Cleveland and Karl Hoke is an outstanding architect and I went to them people because I knew they were good, responsible people." (Petitioners' Brief, Apppendix pp. 42a, 43a.)

Further, from the opinion of the Tax Court:

"One way by which a taxpayer can successfully fulfill his burden of proof where he alleges that the proximate cause of damage to a building was some such natural phenomenon as a subterranean, earth movement or a subsoil condition is to present proof through a specialist or qualified expert in foundation work and subsoil conditions who has made examination of the taxpayer's property above and beneath the surface of the land. Such expert, for example, might conduct his examination by making rather deep, exploratory openings in the earth which might establish a direct cause of cracks in a building." (Petitioners' Brief, Appendix, p. 118a.)

The foregoing statement by the Tax Court carries with it the suggestion that there is more than one way that the taxpayer can fulfill his burden of proof. Trial counsel become educated in trial techniques in the school of experience. The trier of the facts is required to make a determination on the evidence that has been presented by the litigants. If the trier of the facts is permitted to make findings on what an imaginary expert might have found, he might equally well conjure up facts from the same imaginary source as to what the imaginary expert might not have found. This procedure makes a lottery of the function of judicial fact finding.

From the transcript:

"By Mr. Scharfy:

"Q. Mr. Tank, I will ask you what the state of the construction of your residence was in October, 1951. A. Well, it was good up until that time.

"Q. What was the state of completion?

"The Court: Now, Mr. Tank, we are going to give you as much time as we can. The taxpayer has the burden of proof in this case. We assume that you know the facts and we want you to give us quickly accurate answers to these questions. That question didn't call for whether the construction was good, bad or indifferent. Now, how many floors were there in this house?

"The Witness: One.

"The Court: When was the roof put on the house? When counsel asks you what the state of construction was at the end of September or the beginning of October, '51, he wants to know whether the roof was on, the outside was finished, the electricity was in, the plumbing was in and how far along the construction was going, not whether the construction was good, bad, fair or indifferent. If that is your understanding of the question, then you are not going to do very well in this case.

"Now, ask the question again, please." (Petitioners' Brief, Appendix pp. 22a, 23a.)

The threat to a party in interest that "you are not going to do very well in this case" is a heavy blow to inflict for the questionable misunderstanding of a

query that is susceptible of two different interpretations, one of which was given by the witness. If the *examiner* was satisfied that the answer to this question was responsive, that should have been sufficient.

Exhibit 5 was accepted in evidence by the Trial Court without objection from Government counsel, and is as follows:

"The Etchen-Lutz Co.,
"Toledo, Ohio.
"Real Estate.
"Mr. Ray Tank February 22, 1952.
"911 Cherry St.
"Toledo, Ohio
"Dear Sir:

"We have twice viewed your property located at 4327 River Road on lots #8 and#9 Arden Place, Toledo, Ohio.

"We feel that the valuation on what otherwise would be an extremely attractive property has been so depreciated due to the severe and critical slippage of the land toward the river that it is worth, in our minds, for a reasonably quick sale, some place between 45,000 (forty-five thousand) dollars and 47,500 (forty-seven thousand five hundred) dollars.

"Very truly yours,
"William P. Brunson,
"Donald Mortemore."

(Petitioners' Brief, Appendix p. 99a.)

Mr. William P. Brunson, one of the two appraisers, died prior to the date of the trial before the Tax Court. Mr. Donald Mortemore appeared as a witness for the taxpayers. Further, from the opinion of the Tax Court:

"There is nothing in the record to indicate that the realtor, Brunson, had ever made an inspection prior to the cracking, or that he had ever tried to reconstruct its fair market value prior to the damage. The letter of appraisal prepared by the realtor and an associate did not refer to market value before the damage, but merely set forth what the realtors felt the property would sell for on the market. Even if the assumption is made that Mortemore, who assisted Brunson, was fully qualified in this field, and there is much in the record to indicate he was not, some basis for his opinion of the fair market value of the property prior to the damage should have been elicited.

"Petitioner contends that no one makes an appraisal in anticipation of a casualty. While this is undoubtedly true, once a casualty has occurred the fair market value of the property before damage may be reconstructed in a number of ways.

\* \* \* \* \* \*

"It has been concluded above that petitioner failed to prove the cause of the cracks; he did not prove that they were caused by any subterranean movement of earth, or by any slippage of his land toward the river. Since the opinion of fair market value after the damage appears to have been based primarily upon the assumption that there had been slippage of land, it must be rejected as unsound. Furthermore, there is much in the record which indicates that the appraisers must have known that the purpose of the appraisal was to 'file a claim,' to use the language of petitioner.

"The appraisal was made by an older man, having 20 years of experience, and a younger man who was being trained in the real estate field. The younger man testified in this case that he was not fully qualified at the time the appraisal was made to make the appraisal, and that the letter of appraisal had been drafted by the older man, Brunson. Unfortunately Brunson died before the trial. In his letter of appraisal, Brunson referred to 'severe and critical slippage of land toward the river,' but he did not state where any slippage had occurred, or that

he or anyone hired by him had located slippage anywhere on petitioner's land. Without his explanation of his appraisal, it is of very little value. He might have considered reports of slippage not on Tank's land." (Petitioners' Brief, Appendix pp. 125a, 126a–127a.)

The testimony developed the following facts.[9]

One of the appraisers, William P. Brunson, who was deceased at the time of the trial, had been a man of middle age with approximately 20 years or more experience in the real estate business. It was he who actually prepared Exhibit 5. Mr. Donald Mortemore first entered the real estate business in 1946 as a salesman for the Etchen-Lutz Co., one of the real estate firms in Toledo, Ohio; as soon as he joined the Etchen-Lutz Co. in 1946 he commenced studying to prepare for the examination for an Ohio real estate salesman's license. He studied the hand book and manuals for several months and attended an evening real estate course for approximately 13 weeks at the University of Toledo; he took the Ohio examination and received his real estate salesman's license in the spring of 1946, and continued with the Etchen-Lutz Co. until approximately 1953, by which time he had become sales manager and manager of the new-construction department. His duties included holding "open houses," assisting sales personnel, listing properties, appraising properties, negotiating sales of properties and closing the transactions. After leaving the Etchen-Lutz Co. he joined the Grogan Realty Company and was with that company for about a year when he joined the Knopper Construction Company where he worked for approximately a year and a half as a salesman of new homes. He then joined the Dunbar Real Estate Company as sales manager, and from there joined the Pyle Company in May 1956. At the time of the hearing before the Tax Court Mr. Mortemore was superintendent of sales and construction for the Pyle Construction Company of Toledo; from 1946 to the time of the hearing Mr. Mortemore had been constantly in the real estate business engaged in general sales activity of both older and newly-constructed homes in the Toledo and Lucas County area and surrounding suburbs. His experience ran the gamut of styles, construction and locations of homes, and included inexpensive homes as well as those valued as high as $100,000. In connection with his real estate activities, he participated in the determination of fair market value of numerous properties for listing purposes, purchase and sales purposes, and Probate Court appraisals in connection with decedents' properties; prior to the date of the appraisal of petitioners' residence, in February 1952, he had appraised an average of 5 houses per week, for a period of approximately 6 years and, although Mr. Mortemore had had no direct construction experience prior to the making of the appraisal of petitioners' residence, between the time of such appraisal and the hearing of this cause, he had had extensive direct construction experience. His duties as superintendent of construction and sales for the Pyle Construction Company included personal supervision of the construction of new residences and, in the then current fiscal year of 1957, Mr. Mortemore personally supervised and processed the construction of approximately 30 houses for the Pyle Construction Company. In the light of Mr. Mortemore's more recent experience in supervising the construction of new homes, he was of the opinion that the damage occasioned to petitioners' residence was not due to ordinary settling or cracking, but was caused by something unusual. He viewed the property shortly before the Tax Court hearing to refresh his recollection of the facts concerning the house, and his opinion at the time of trial was that the appraisal made in February 1952 was correct.

9. Uncontroverted.

As indicated at page 79a of Petitioners' Brief and Appendix the following is set forth from the transcript:

"The Court: That is selling operations. What has your training been in appraising of realty?

"The Witness: My experience in appraising—

"The Court: What has your training been?

"The Witness: My training been?

"The Court: What has your training been for appraisal work? Are you a registered appraiser?

"The Witness: Not registered.

"The Court: Are you a member of any appraisers organization? Are you a certified appraiser?

"The Witness: No, I am not.

"The Court: Is there an Appraisers Board or Appraisers Organization in Toledo?

"The Witness: There is. However, in Toledo—

"The Court: What is the name of it?

"The Witness: Well, it's the Ohio Association of Appraisers.

"The Court: And you are not a member of that Association?

"The Witness: That is true.

\* \* \* \* \* \*

"The Court: After all, appraisal work is a special field in the real estate business. People make a profession of it. This man (Mortemore) is not a professional appraiser. He was not in 1952."

 It is common knowledge that a person does not become a more accomplished violinist through the process of merely joining the Musicians' Union, that a trial lawyer does not become more adroit as a trial lawyer when he pays the initiation fee to the local Bar Association. The appraiser's capability is not, in our opinion, enhanced by virtue of memberships he holds in appraisal organizations. The absence of certificates, memberships, and the like, on the other hand, does not in and of itself detract from competency which otherwise exists.

It is reasonable and appropriate to assume that these appraisers used a formula in arriving at their evaluation of the property here in question. If the Commissioner was not satisfied with the appraisal method used, he could have objected to the introduction of the exhibit. He could have challenged the validity of the appraisal on cross-examination. As a third alternative he could have found an appraiser somewhere within the structure of the Bureau of Internal Revenue during the period of 6 years to make an independent appraisal of the premises and present that appraisal to the Tax Court.

What we have attempted to do in this treatment of the present review is to point out some of the instances which illustrate the tendency of the Tax Court to ignore plain, uncontroverted testimony, and to reach for facts contrary to the testimony without there being any basis in fact for so doing. Certainly, the trier of the facts may disbelieve witnesses. We say, however, that the trier of the facts completely ignored or disregarded what appears to be a substantial quantity of reliable testimony without giving any explanation therefor. In line with our thinking is the language appearing in Loesch & Green Const. Co. v. Commissioner, 6 Cir., 1954, 211 F.2d 210, 212, which has such direct application to what is presented here that we quote a portion therefrom as expressing our views:

"The Tax Court cannot reject the evidence of all of the witnesses and, upon a record containing no evidence to support its decision, make a determination that salaries are excessive. J. H. Robinson Truck Lines, Inc. v. Commissioner, 5 Cir., 183 F.2d 739. 'Since the Commissioner offered no evidence, the petitioner was denied the opportunity of examining the correctness of his computations; and was left to stand upon its own proof, none of which was refuted. Therefore, we think, the burden of presenting evidence to

rebut any presumption in favor of the Commissioner's findings was fully met, and the Tax Court clearly erred in finding that the salaries were unreasonable.' R. P. Farnsworth & Co., Inc. v. Commissioner, 5 Cir., 203 F.2d 490, 492. Where unimpeached, competent, and relevant testimony on behalf of a taxpayer is uncontradicted, it may not be arbitrarily discredited and disregarded, and the Tax Court cannot reject or ignore this evidence and determine the propriety of the amount of salaries paid upon its own innate conception of reasonableness. A. & A. Tool & Supply Co. v. Commissioner, 10 Cir., 182 F.2d 300; Hightower v. Commissioner, 5 Cir., 187 F.2d 535. As so well expressed by the late Judge Denison in Rookwood Pottery Co. v. Commissioner, 6 Cir., 45 F.2d 43, 45, 'when the proofs so introduced remain unchallenged by contrary proofs or by destructive analysis, it was the duty of the commissioner to decide the issue in accordance with the proof then appearing before him; and it was, we think, the duty of the board to take the same view.' Since the testimony introduced on behalf of petitioner was unimpeached, competent, relevant, and uncontradicted, and since the proofs were unchallenged by contrary proofs or by destructive analysis, it is our conclusion that the Tax Court erred in failing to sustain the salaries paid to the officers of petitioner as reasonable; and the case is remanded to the Tax Court with instructions to set aside the deficiency assessments complained of by petitioner."

For these reasons the decision of the Tax Court is reversed and the case is remanded for a redetermination of petitioners' tax liability on the basis of the allowance of the proven casualty loss of $21,700.00.

ALLEN, Circuit Judge (concurring).

I concur in the result upon the authority of Loesch & Green Construction Co. v. Commissioner of Internal Revenue, 6 Cir., 211 F.2d 210.

I do not concur in certain parts of the opinion. It seems to me that the holding of the majority of the court that the trial court "completely ignored or disregarded what appears to be a substantial quantity of reliable testimony without giving any explanation therefor," is both inaccurate and unfortunate. This is a question of considerable importance because accusations of this kind are made so frequently on motions for new trial and in appellate and certiorari proceedings. Judges of the finest character and standing are constantly attacked upon this alleged ground and for this court to hold that a trial court ignored the evidence will open the door to increased attacks in this direction. This is particularly true if the record herein does not sustain the holding.

To me the trial court's opinion, which covers some 12 pages of the printed record, and parts of which are included in the majority opinion herein, demonstrates that the trial court considered the evidence exhaustively and gave an explanation for its construction of it. Where the trial court erred was in its conclusion that, when appellants had offered evidence of various witnesses as to the existence of a casualty and the Commissioner offered no evidence to the contrary, appellants had not met their burden of proof. Loesch & Green Construction Co. v. Commissioner of Internal Revenue, supra, 211 F.2d 212.