Vladimir and Betty Jane Dvorkovitz * v. Commissioner. Dvorkovitz v. Commissioner
Docket No. 5228-63.
United States Tax Court
T.C. Memo 1966-11; 1966 Tax Ct. Memo LEXIS 269; 25 T.C.M. (CCH) 43; T.C.M. (RIA) 66011; January 14, 1966
*269 In 1960 cracks appeared in petitioners' home and new swimming pool. Held: Petitioners are not entitled to a deduction for a loss described in sec. 165 (c)(3), I.R.C. 1954, because they failed to prove that a casualty occurred and caused such damage. Vladimir Dvorkovitz, pro se, 130 John Anderson Dr., Ormond Beach, Fla. Marshall H. Barkin, for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion *270 SIMPSON, Judge: The respondent determined a deficiency of $2,421.60 in the petitioners' income tax for the year 1960. The only issue in this case is whether petitioners sustained a deductible casualty loss to their residence in that year. Findings of Fact Some of the facts were stipulated and those facts are so found. Petitioners, Vladimir and Betty Jane Dvorkovitz, are husband and wife. During the taxable year 1960, they resided in Parkville, Missouri, and filed their joint income tax return with the district director of internal revenue at St. Louis, Missouri. On their 1960 return, petitioners deducted $5,574.50 for a claimed casualty loss, explained as follows: Water heavage - damage to
basement. Estimate of re-
pairs to return to normal
$ 447.50
Major cracks in floor of con-
crete swimming pool in-
stalled May 1960. Estimate
of repairs to return to
normal condition
5,127.00
Total
$5,574.50 This entire deduction was disallowed, resulting in an asserted deficiency of $2,421.60. Petitioners purchased their home for $26,900 in April 1960. Immediately thereafter they made improvements on the property which included addition of another room, *271 draperies, carpeting, a concrete patio, fencing, a swimming pool, and other improvements. On April 14, 1960, Vladimir contracted with T. M. Haynes, a builder, for construction of the swimming pool. The final cost of construction was $5,510.50. The pool was 17 ft. by 38 ft., with a depth of 9 ft. to 3 ft. It was built on a hillside with the shallow end and the crest of the hill lying to the north of the property. The bottom of the pool is generally below the natural grade of the hill. The pool was drained by siphoning the water through a hose and out the side of the pool. The pool has a hydrostatic valve attached to its floor. The purpose of such a valve is to allow ground water, when under natural hydrostatic pressure, to escape through the valve and into the pool when the pressure from below the floor is greater than that from above. It allows water to flow in one direction only, into the pool. When the pool is filled with water, the pressure from above, due to the depth of the water, is generally much greater than the hydrostatic pressure from below, and the valve will automatically stay shut. Thus, the water from above cannot escape into the ground. The pool was used from about *272 May 29, 1960, until October 17, 1960, when it was drained. [1] Sometime thereafter petitioners departed for a trip out of the country. Upon their return, they observed cracks in the floor and walls of the pool and found that it would not hold water. These cracks were first observed around the middle of December 1960. At approximately the same time, Vladimir noticed cracks and fissures in the cement wall and floor of the basement of his home. The petitioners, in filling out their income tax return, relied upon an offer to repair the floor of the pool submitted by Americana Pools Inc., signed by T. M. Haynes, Jr. Petitioners made no repairs to the swimming pool. Petitioner Vladimir had difficulty in selling the house and received $7,000 less than he expected for it. In approximately February of 1962, petitioners *273 placed their home for sale. In May of the same year they moved to Florida. In early 1963, the property sold for $29,000. We find that petitioners incurred damage to their swimming pool subsequent to mid-October 1960; that this damage became apparent in mid-December 1960; and that the cause of the damage is not known. Petitioners' home was not constructed by T. M. Haynes, who built the swimming pool. Beyond this, the only finding justified by the record is that petitioner noticed cracks and fissures in the cement wall and floor of the basement of his home in mid-December 1960. Opinion The issue in this case is whether petitioners sustained a deductible casualty loss to their residence in 1960. Section 165(a) of the Internal Revenue Code of 1954[2] provides a deduction for losses not compensated for by insurance or otherwise. In the case of individuals, a loss of property which is not used in a trade or business or not held for the production of income is deductible if it meets the conditions of section 165(c)(3). That section permits a deduction if the loss arises from fire, storm, shipwreck, or other casualty, or from theft. [3] The petitioners contend *274 that the damage to their pool and basement arose from a casualty. The term "casualty" has repeatedly been defined as an event due to some sudden, unexpected, or unusual cause. Rosenberg v. Commissioner, 198 F. 2d 46 (C.A. 8, 1952), reversing, on other grounds, 16 T.C. 1360 (1951) A casualty in the tax sense excludes the progressive deterioration of property through a steadily operating cause. Ray Durden, 3 T.C. 1 (1944), *275 acq. 1944 C.B. 8. The principle of ejusdem generis is applied, and the event must be of the same general nature as a fire, storm, or shipwreck. Charles J. Fay, 42 B.T.A. 206 (1940), affd. 120 F. 2d 253 (C.A. 2, 1941). The first question to be decided is whether the petitioners have established a casualty loss arising from damage to their basement in the amount of $447.50. The sole piece of direct evidence on this issue is the stipulation that Vladimir noticed cracks and fissures in the wall and floor of the basement in mid-December 1960. From this we are asked to conclude that a casualty occurred in 1960 which damaged the petitioners' house to the extent of $447.50. We cannot so find. The burden of proof in establishing a deductible loss and the amount of that loss is on the taxpayer. Burnet v. Houston, 283 U.S. 223 (1931), affirming 13 B.T.A. 279 (1928); Rudolf Lewis Hoppe, 42 T.C. 820 (1964). Petitioners have not favored the Court with any evidence concerning the condition of the basement prior to December 1960. [4] We know only that the home was purchased in April of that year. In addition, petitioners *276 have not submitted any evidence concerning the cracks themselves. We do not know whether there were two cracks each an inch long, or two hundred cracks each ten feet long. We do not know if they were sufficiently deep to admit water or whether they were simply shallow cracks in the surface of the basement wall and floor. The amount of damage must be shown in some ascertainable manner. Anne B. Richardson, 1 B.T.A. 576 (1925). It may be the petitioners' theory that this Court will infer that whatever casualty, if any, befell the swimming pool also caused cracks in the basement. In order to draw this inference, some showing of causation is required, and as to this element the petitioners also carry the burden of proof. James M. Kemper, 30 T.C. 546 (1958), affd. 269 F. 2d 184 (C.A. 8, 1959). Petitioners have made no effort to show the cause of their damage. In summary, *277 since the petitioners have not proved the nature and extent of this damage, its cause, or the time of its occurrence, we cannot find that they sustained a deductible casualty loss to their basement in 1960. The second question in this case is whether the petitioners sustained a deductible casualty loss when their swimming pool cracked. It is axiomatic that the petitioners have the burden of proof, but in this instance there is some confusion on the part of the petitioners as to what they must prove. Petitioners' brief argues that if a crack occurs in concrete, it must occur suddenly. To this proposition it is added that properly poured concrete will not crack unless some external force is applied. From these two characteristics of the material petitioners conclude that the loss was both sudden and caused by an external force. The thrust of this argument, and its defect, is best illustrated by excerpts from petitioners' own brief: The petitioners were aborad when the loss occurred, but it would seem apparent that the results of the loss are sufficient and do not require a careful and detailed scientific and engineering explanation of how it happened. Even an earthquake is not *278 a complete answer as to the cause - since the factors producing the earthquake which caused the damage are left unexplained. Forces of nature are such that it is impossible at the present state of knowledge to give an original cause for a natural phenomena. We are in a chicken and an egg dilemma. * * * Either a tremendous force from above, or below, or sideways, must have been applied. What that force is or was, to have done this damage, is speculative. The builder insisted that it was heavage. The petitioners don't know and believe the cause is not relevant. * * *
Because of this evidence we must conclude that the loss was a casualty, regardless, if the original cause was due to the earth crinkling as it cooled a millenium ago. * * *
As we understand it, petitioners' argument is twofold. First, they argue that they need not prove the cause of the loss because any sudden damage constitutes a casualty. Second, they urge that from the nature of the damage, the occurrence of the casualty can be inferred. The first contention must be rejected as a matter of law. The reports are replete with cases holding that sudden losses have been caused by events not amounting to *279 a casualty. William J. Powers, 36 T.C. 1191 (1961); Waddell F. Smith, 10 T.C. 701 (1948); see also, Deming, "Establishing Casualty and Disaster Losses," 21st Ann. N.Y.U. Tax Inst. 143 (1963). If the damage was caused by a mere defect in construction, it is not a casualty no matter how rapidly the damage becomes manifest. Kipp v. Bingler, an unreported case ( W. D. Penn. 1964, 14 A.F.T.R. 2d 5735). A casualty is an event which causes the loss, and to hold that only the damage need be shown would permit the petitioners to avoid their burden of proof and would eliminate the need to prove a casualty at all. [5]
Some cases, it is suggested, hold that damage arising from an unexplained cause can constitute a casualty. Harry Johnston Grant, 30 B.T.A. 1028 (1934); Ferris v. United States, an unreported case ( D. Vt. 1962, 9 A.F.T.R. 2d 1414). *280 A close reading of these cases, however, does not support this view. In the Grant case, supra, petitioner's residential land was extensively damaged when a large portion of it began to sink and slide towards the lake. The causes of this sinking were several, and none could be identified with certainty as the sole cause. The movement of the subsoil, however, was found to be the cause of petitioners' property damage. The Board held as follows at page 1035: The evidence is clear and undisputed that the sinking was unexpected. * * * It was not an ordinary sliding of the bank * * * but was the result of a subterranean disturbance, the exact cause of which is not known or ascertainable. It was an unusual effect of several causes and conditions. We hold, therefore, that the phenomenon, as heretofore described, was a casualty within section 241(a)(16). [Emphasis supplied.] Thus, it is clear that the movement of the subsoil constituted the casualty in Grant, not merely the sudden occurrence of damage. Petitioners rely upon the case of Ferris v. United States, supra. There it was found that a portion of taxpayer's garage wall tipped into the garage causing extensive damage. The house *281 in question had stood in unaltered condition for at least six years. Between the time plaintiff left for work in the morning and his return that evening, the damage occurred. There was no doubting the suddenness of the damage. During the 18 days preceding the damage, precipitation was 35 percent above the average for a ten-year period commencing seven years before the loss. The days of freezing and thawing during this 18-day period were 37 percent above the average. In addition, the number of freezing and thawing days were 127 percent above the same 10-year average. Other unusual weather conditions were found to exist, and all of these conditions were found to have asserted unusual pressures upon the house and garage. These findings were supported by similar accidents in the neighboring area. In addition, one plaintiff was an engineer and testified as to breaks in water lines at his plant and other unusual occurrences. He and the Government both suggested that the damage was caused by hydraulic action rather than subsoil slippage. The court, however, rejected the Government's view that hydraulic action was a yearly phenomenon and stated as follows: Such, however, is not the history *282 or heritage of Vermont homes. Come each spring, the winter's snow and ice disappear, the waters run off to the rivers and the lovely rare and fragile wild flowers unfold themselves. The very essence of life permeates the Green Mountain State. It is a most unusual occurrence when foundations of homes in this lovely granite and marble mountainous state suddenly collapse. To the contrary of the Government's contention, such an event causes one to seek for the cause of the unusual event. The court went on to hold that the damage was unexpected and unusual, relying on a revenue ruling permitting a deduction for damage caused by subsoil shrinkage. Upon the basis of all the evidence, the court concluded that a deductible casualty was established. We cannot regard Grant or Ferris as authority for the proposition that taxpayers need not prove the cause of their damage, or that any sudden loss is a casualty. In both cases, there was reliable, competent evidence concerning the cause of the taxpayer's damage. The cause of the damage must always be shown. Raymond Tank, 29 T.C. 677 (1958), reversed on other grounds, 270 F. 2d 477 (C.A. 6, 1959). In arguing that they *283 need not prove the ultimate cause of their damage, petitioners confuse the cause of damage with the cause of the casualty. Certainly, "In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the discovery of America and beyond." Prosser, The Law of Torts, 240 (1964). In determining the cause of a loss, the law does not seek an ultimate cause, but an immediate cause as selected by common sense and dictated by tax policy. The law does not require proof of the cause of a storm, the cause of a shipwreck, or the cause of an "other casualty," but in these cases, the law does require proof that a storm, shipwreck, or other casualty has occurred and that it caused the loss. In Grant, for example, it was impossible to prove what caused the subsoil to move, but the movement itself was proven. This movement was the casualty, and was shown to be the cause of the physical damage. Thus, although the cause of the casualty could not be ascertained, it was proven that the damage was caused by a casualty. Now let us turn to the petitioners' argument that the occurrence of a casualty can be inferred from the nature of the damage. In considering *284 this alternative argument, we must review the evidence. We know that petitioners' pool was built of poured concrete. When the damage occurred, "the concrete was lifted up out of the crack." In attempting to ascertain the cause of these cracks, we have searched the record in vain for some proof. In the course of testimony by the only witness, Vladimir said: It is only speculation on my part, a combination of cold where the water came underneath it or what caused the casualty, the alleged casualty, but it is also my contention, it really don't make any difference what the casualty was. * * * Thus, although the petitioner alluded to the possibility that the damage was caused by hydraulic pressure, he did not express his own belief or opinion that such pressure in fact caused the damage. Consequently, his testimony has left us with no basis for a finding on the issue of causation. Petitioner's testimony tends to show that cracks in concrete appear suddenly, but this says nothing about the cause of those cracks. The pressures which caused the cracks could have been building up since the date of construction, or in a short space of time. The cause could have been faulty construction. *285 There is nothing in the record to suggest that the pool was built in accordance with standard architectural requirements. In fact, there is testimony by Vladimir that the construction of this pool was atypical. He testified that his pool had extra depth. We do not know what unusual pressures this situation may have caused, if any. We do know that Vladimir had the pool built deeper than usual, and that special construction was employed so that he could drain the pool contrary to the usual practice in Kansas City. If petitioners' pool cracked because of this unique feature of construction or use, clearly there was no casualty as that term is used in section 165(c)(3). Kipp v. Bingler, an unreported case ( W. D. Penn. 1964, 14 A.F.T.R. 2d 5735); William J. Matheson, 18 B.T.A. 674 (1930), affd. 54 F.2d 537 (C.A. 2, 1931). In their petition, taxpayers have suggested that hydrostatic pressure may have been responsible for cracks in the swimming pool. By this we believe they mean the even pressure of ground water exerted upon the exterior wall and floor of the pool. [6] In this connection, we note two facts: First, there was a hydrostatic valve on *286 the floor of the pool which would allow ground water under pressure to escape into the pool; second, in the entire record of this case, there is not a shred of evidence concerning the existence, nature, or extent of hydrostatic pressure on petitioners' property. The stipulation in this case states that the valve on the floor of the pool operates under "natural" hydrostatic pressure. The result of this feature should have been to reduce the hydrostatic pressure under the floor of the pool. However, it is clear that the floor of the pool, as well as the walls, cracked. If petitioners wish us to find that the ground water pressure in 1960 was unnatural, we are unable to do so since they have submitted no evidence on this point. If we are to infer that the valve was not working, then the cause of the property damage clearly was not a casualty. Local climatological data as compiled by the United States Department of Commerce was admitted in evidence. What it is that petitioners wish to prove with these figures is not clear to the Court. It may be that this evidence was submitted so that *287 the Court could infer the existence of excessive hydrostatic pressure from the amount of precipitation and the temperature in 1960. The evidence does not warrant an inference concerning such pressure on petitioners' pool. In order to infer the existence of unusual hydrostatic pressure, it would be necessary to have certain information about the ground surrounding the pool. We would have to have some information about the depth of the water table in that area, since the existence of hydrostatic pressure would depend upon whether the water table reached, or rose above, the bottom of the pool. [7] To show that precipitation occurred, or even that it was excessive, does not justify an inference that unusual hydrostatic pressure was exerted on the pool, because the water table may have been so deep that even though it rose, it did not reach the bottom of the pool, or because the drainage of the land or the condition of the soil was such that the precipitation did not affect the height of the water table. We have no evidence concerning the depth of the water table or evidence from which we could infer the effect that precipitation would have upon it. Therefore, the climatological data alone *288 will not support a finding that hydrostatic pressure caused the damage. It is possible that excessive hydrostatic pressure under proper circumstances might rise to the stature of a casualty. Rev. Rul. 54-85, 1954-1 C.B. 58. But, in view of the record, we need not decide that question. In conclusion, the suggestion that the damage may have been caused by hydrostatic pressure will not suffice as proof of a casualty in this case. Even assuming we were able to find that abnormal hydrostatic pressure existed, it would be incumbent on petitioners to show that this pressure caused the damage. The statute permits a deduction only if the loss of property arises from a casualty. The language of this statute requires a showing of causation, and its absence is fatal to taxpayers' case. In James M. Kemper, 30 T.C. 546 (1958), affd. 269 F. 2d 184 (C.A. 8, 1959), the taxpayer argued that certain of his trees had been killed by a drought. This Court did not find it necessary to pass on the question of whether a drought was a casualty because petitioner *289 did not prove that drought was the cause of the trees dying. The evidence in that case was equally consistent with a theory that drought in the years prior to the tax year was the cause of death, or that a disease carried by beetles had infested the trees. In summary, petitioners have failed to prove a casualty occurred, or that it caused their property damage. They have offered no substantial evidence from which either could be inferred. For these reasons, Decision will be entered for the respondent. Footnotes
*. This case was heard by Judge Morton P. Fisher and briefs were duly filed. Judge Fisher died on February 11, 1965. This case, not having been disposed of, was reassigned to Judge Charles R. Simpson on September 17, 1965, and notice was given to the parties that any request for rehearing or reargument might be presented to him within 30 days. No such requests have been received.↩
1. This fact was part of the stipulation. We note that at trial Vladimir testified that he was in Europe from September 1 until about November 15. We resolve this possible discrepancy in favor of the stipulation as best representing the considered recollection of petitioners. In addition, we believe this approach is most consistent with Rule 31(b), Tax Court Rules of Practice.↩
2. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated. ↩
3. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - * * *
(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. No loss described in this paragraph shall be allowed if, at the time of the filing of the return, such loss has been claimed for estate tax purposes in the estate tax return.↩
4. The petition states, indirectly, that this was a new home. But the paragraph so alleging was denied by the respondent, and allegations of fact in a petition are not evidence. Sam Greengard, 8 B.T.A. 734 (1927), affd. 29 F. 2d 502↩ (C.A. 7, 1928).
5. The regulations repeatedly refer to "casualty or other event." [Emphasis added.] Sec. 1.165-1(d)(2), Income Tax Regs.↩ See also "Disasters, Casualties and Thefts," p. 4, U.S. Treasury Department Document No. 5174 (12-64), as evidence of Internal Revenue Service practice.
6. Meinzer, "Outline of Ground-Water Hydrology," U.S.G.S. Water-Supply Paper No. 494, 37 (1923).↩
7. Meinzer, "Outline of Ground-Water Hydrology," U.S.G.S. Water-Supply Paper No. 494, 37 (1923).↩